[No. B140904. Second Dist., Div. Seven. Jan. 28, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
JERRELL JEROME LEE, Defendant and Appellant.

**COUNSEL**

Dan Mrotek, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mark E. Turchin, Acting Assistant Attorney General, Lance E. Winters and Valerie A. Baker, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, Acting P. J.**—Defendant Jerrell Jerome Lee appeals from the judgment following a jury trial in which he was found guilty of one count of first degree murder. We reverse.

### FACTS AND PROCEEDINGS BELOW

When this case was assigned for trial from the master calendar court, defense counsel left the courtroom without filing a peremptory challenge to the trial judge under Code of Civil Procedure section 170.6 (section 170.6). Counsel returned to the master calendar court a short time later and attempted to file the challenge. He explained initially he had understood the matter was not being assigned for trial but only for a hearing on pending motions. The master calendar court ruled its trial assignment was clear and the challenge was untimely.

The evidence at trial showed Tyrone (Rabbit) Haywood was shot in the back of the head at point blank range while he squatted on the ground shooting dice with two friends. The jury convicted fellow gang member, Jerrell (Midnight) Lee, principally on the strength of a statement to police by another member of the gang, Reynard (Don Juan) Saxon, identifying defendant as the killer. Although Saxon recanted his statement the next day and testified at trial he did not see who shot Haywood, the trial court allowed the prosecution to play a tape recording of Saxon's statement as impeachment and substantive evidence against defendant.[1]

We discuss the facts in more detail in our resolution of the issues below.

For the reasons set forth below, we conclude defense counsel was not negligent in failing to file a timely peremptory challenge to the trial judge but rather his failure stemmed from an honest mistake. We further find, however, the police coerced Saxon's statement incriminating defendant and admission of the statement was highly prejudicial to defendant. As a separate, independent and sufficient ground for reversal, we find the court

---

[1]Evidence Code section 1235; *People v. Hawthorne* (1992) 4 Cal.4th 43, 55 [14 Cal.Rptr.2d 133, 841 P.2d 118].

committed prejudicial error in admitting evidence Saxon took and failed a lie detector test before changing his story to incriminate defendant.

DISCUSSION

I. *The Court Did Not Err in Failing to Discharge Defendant's Attorney for Negligence in Not Filing a Timely Peremptory Challenge to the Trial Judge and the Attorney's Negligence, If Any, Did Not Prejudice Defendant.*

Defendant contends he received ineffective assistance of counsel because his court appointed attorney failed to file a timely peremptory challenge to the judge assigned to try his case.[2] He argues he called this negligence to the trial judge's attention prior to the commencement of trial, and the judge should have dismissed his counsel and appointed a new one under *People v. Marsden*.[3] Alternatively, he argues his counsel's ineffective assistance entitles him to a reversal of the judgment under *Strickland v. Washington*[4] and *People v. Pope*.[5] We reject both arguments.

A. *Factual Background*

When defendant's case was called in the master calendar court, the People answered "ready" but defendant's appointed counsel, James Banks, told the court he was not ready to go forward because there remained an unresolved discovery issue. The master calendar judge responded: "Okay. I will send [the case] back to [department] 130. [Judge Alarcon] can rule on it. By the way, for any reason he doesn't rule, he is open for, ready for trial. The matter is transferred to 130 for further proceedings." After further discussion regarding the defense discovery motion the master calendar judge stated: "What I'm saying it's an issue I really can't resolve. Judge Alarcon is familiar with the case, and he is open. It's the court's policy to send it back. He is open. He is ready for even a trial, or if he wants to continue it, it's okay with me."

A half-hour to an hour later, defense counsel returned to the master calendar court asking for clarification of the court's transfer order. The following colloquy took place:

"Mr. Banks: Your honor, on that Lee matter. You sent us up to 130, that was for motions?

---

[2]Code of Civil Procedure section 170.6.
[3]*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].
[4]*Strickland v. Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674].
[5]*People v. Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].

"The Court: Motions and or trial.

"Mr. Banks: Does that mean that I have to file a 170 in here before?

"The Court: You would have to if that's what you intend to do. Actually, your time has passed. But if there is some confusion, I might consider it. It was for motions and or trial.

"Mr. Banks: I understood the motion part. . . . That's why I came back, your honor. I thought about it. I said, wait a minute, is this for trial also?"

The court asked the prosecutor to state the People's position. The prosecutor replied he believed a section 170.6 motion at this point would be untimely. He did concede, however: "I was a little bit confused at first myself. . . . [M]y initial understanding was you were just talking about the discovery motion, then you made some clarifying remarks and I understood the court to mean, no, for the motions and for the trial."

After reading a transcript of the earlier proceeding the master calendar judge ruled that "while there is a possibility [of confusion] the court resolved it at the end by indicating Judge Alarcon would either try it or hear the motions, I didn't care what he did." The judge concluded the matter by ruling "the 170.6 is denied as untimely."[6]

The issue of the 170.6 motion was taken up again before Judge Alarcon in department 130. Defendant Lee told the court: "I'm invoking my constitutional rights of a fair trial which I will be deprived of if I continue to have my case heard in this courtroom. . . . I was trying to file a 170.6 two or three months ago when I first got in this court, when . . . that incident first occurred.[7] I was trying to do a 170.6, and they didn't do it. . . . [So] that can't be expected because they not representing me anymores." Defense counsel and the prosecutor each gave their version of what occurred in the master calendar department. Defense counsel once more explained he was confused as to whether the master calendar court was transferring the case back to department 130 for motions only or for motions and trial. The prosecutor again conceded he too was confused initially but the master calendar judge had later clarified the transfer was for motions and or trial.

During this discussion, the parties and the trial court had this exchange:

---

[6]The parties do not dispute the correctness of this ruling, assuming the trial assignment to department 130 was made in the prior proceeding. (*People v. Superior Court (Lavi)* (1993) 4 Cal.4th 1164, 1180, fn. 12, 1182-1183 [17 Cal.Rptr.2d 815, 847 P.2d 1031].)

[7]Defendant is referring to his earlier unruly behavior in Judge Alarcon's courtroom which he now fears may have prejudiced the judge against him.

"Mr. Banks: Are we having a *Marsden?*

"Mr. Anger [the prosecutor]: It sounds like [defendant] wants a *Marsden.*
[¶] . . . [¶]

"The Court: I don't think it's a *Marsden.* [To the defendant:] What were
you going to say?

"The Defendant: No."

Following this discussion, Judge Alarcon read the transcript from the
initial proceeding transferring the case to his courtroom and concluded: "It's
clear from the record counsel knew that the case was being sent out for trial.
Whether the defense and the People say they didn't know, I think the
record's clear." Judge Alarcon ruled he would not disturb the master calen-
dar court's decision on the timeliness of the motion.[8]

> **B.** *The Court Did Not Err in Failing to Discharge Defendant's
> Attorney for Negligence in Not Filing a Timely Peremptory Challenge to
> the Trial Judge.*

Defendant contends the trial court (Judge Alarcon) should have treated his
complaint about his attorney's failure to file a section 170.6 motion as a
*Marsden* motion and discharged the attorney for incompetence. We disagree
with this contention for several reasons.

In *Marsden,* the court held a defendant has the right to have ap-
pointed counsel discharged and other counsel appointed " ' "if it is shown
. . . the right to the ·assistance of counsel would be substantially im-
paired" ' " if the request for discharge is not granted.[9] In seeking discharge
of a court appointed attorney the defendant must show more than the fact the
attorney made a mistake, he must show lack of competence.[10]

The facts in this case do not demonstrate a lack of competence on
the part of defense counsel. Rather, they show he made a good faith mistake
in his interpretation of the master calendar court's transfer order—a mistake
the prosecutor also admitted to making, at least initially. This is not a case
like *People v. St. Andrew,*[11] in which the court held defense counsel's
ignorance of the procedures under section 170.6 denied his client the effec-
tive assistance of counsel. Here, defense counsel was aware of the proce-
dures under section 170.6 but was unaware an event had occurred which
triggered those procedures.

---

[8]Defendant also filed a challenge for cause against Judge Alarcon, which was also denied.
[9]*People v. Marsden, supra,* 2 Cal.3d at page 123, citations omitted.
[10]*People v. Marsden, supra,* 2 Cal.3d at page 126.
[11]*People v. St. Andrew* (1980) 101 Cal.App.3d 450, 456 [161 Cal.Rptr. 634].

In any event, the record does not show defendant made a *Marsden* motion for discharge of his attorney. Mere grumbling about his counsel's failure to file a 170.6 motion is insufficient. Although the defendant need not file "a proper and formal legal motion" he must express "at least some clear indication . . . that he wants a substitution of attorney."[12] The record in the present case not only fails to contain an implied request for discharge of counsel, but defendant responded in the negative when the court asked him if he was making a *Marsden* motion.[13]

Finally, even assuming defendant's statements could be construed as a *Marsden* motion, the trial court did not err in denying it. The court allowed defendant to say all he wanted to say about the proceedings up to that point. Nothing defendant said and nothing in the record demonstrates his attorney's failure to file a timely 170.6 motion was anything other than a good faith mistake.

### C. *Defense Counsel's Negligence, If Any, Did Not Prejudice Defendant.*

For reasons similar to those stated above, we find no basis for reversing defendant's conviction on the ground of ineffective assistance of counsel.

The record shows counsel's failure to file a timely section 170.6 motion was not due to his failure to act in the manner reasonably to be expected of a competent attorney proceeding as a diligent advocate.[14] The failure stemmed instead from counsel's mishearing, misinterpreting or misunderstanding the master calendar court's transfer order. Counsel did all he could to rectify his mistake once he realized it. An honest mistake does not deprive the defendant of his constitutional right to effective assistance of counsel.

Furthermore, defendant cannot show prejudice. His challenge to Judge Alarcon for cause was rejected and he did not seek review of that ruling. He has not shown the loss of his 170.6 motion deprived him of a defense nor has he submitted even one example of prejudicial treatment by Judge Alarcon.[15]

---

[12]*People v. Lucky* (1988) 45 Cal.3d 259, 281, footnote 8 [247 Cal.Rptr. 1, 753 P.2d 1052].

[13]We take defendant's statement he could not expect his attorneys to file a 170.6 motion on his behalf because "they not representing me anymores" to be a reference to the several appointed counsel who represented defendant before Banks and not a charge Banks was providing ineffective assistance of counsel. The oral and written statements by the defendant in this case show he had a basic understanding of criminal procedure and thus it is reasonable to presume he knew what a *Marsden* motion was.

[14]*People v. Pope, supra,* 23 Cal.3d at page 425.

[15]Compare *People St. Andrew, supra,* 101 Cal.App.3d at pages 456-457.

## II. *Saxon's Statement Identifying Defendant as the Killer Was the Product of Police Coercion and It Was Prejudicial Error to Admit It.*

█ Over defendant's objection, the trial court permitted the People to introduce as a prior inconsistent statement the tape-recorded statement of Reynard Saxon identifying defendant as the person who shot Haywood. The court had previously determined Saxon's statement to the police was voluntary. On appeal, defendant renews his objection to admission of the tape on the ground the police coerced Saxon's statement by making improper threats, misrepresentations, promises of leniency, and exploiting his areas of vulnerability. We conclude the police coerced the statement by an improper threat to try Saxon for the murder unless he named defendant as the killer.

The parties agree defendant had standing to challenge the admissibility of Saxon's statement on the ground it was coerced.[16] They also agree that where, as here, the facts regarding the alleged coercion are not in dispute we are to review the record de novo to determine whether, based on the totality of the circumstances, Saxon's statement was voluntary.[17]

### A. *Procedural Background.*

Reynard Saxon was in the courtyard of an apartment building shooting dice with Haywood (Rabbit) when he heard shots close by. At trial, Saxon testified when he heard the gunfire he tucked into a fetal position with his forehead on the ground and stayed that way until approximately a minute after the shooting stopped. He then ran to the nearest apartment and dove through the open door. While he was on the ground he never lifted up his head or peeked through his hands. Therefore, he did not see who shot Haywood.

By way of impeachment and as substantive evidence of defendant's guilt, the prosecution played a tape recording for the jury in which a police polygraph examiner, Youngblood, interrogated Saxon about Haywood's shooting. Saxon told Youngblood defendant killed Haywood. The prosecution also played a tape recording made 15 to 20 minutes after the first one in which Saxon told two police officers defendant shot Haywood.[18] Saxon recanted this statement the next day.

---

[16]See *People v. Underwood* (1964) 61 Cal.2d 113, 124 [37 Cal.Rptr. 313, 389 P.2d 937].

[17]*People v. Anderson* (1990) 52 Cal.3d 453, 470 [276 Cal.Rptr. 356, 801 P.2d 1107]; *People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1484 [22 Cal.Rptr.2d 126].

[18]Due to the short time period between the two interviews we attribute Saxon's second statement to the coercion which produced the first. (See *People v. Cahill* (1994) 22 Cal.App.4th 296, 316 [28 Cal.Rptr.2d 1].)

Saxon told the jury his statement naming defendant as the killer was false. He only made it because Youngblood pressured him to name defendant as the killer or face trial for the murder himself.[19]

We have independently reviewed Saxon's interrogation by Youngblood to determine whether his statements were voluntary. From our review we conclude the police impermissibly coerced Saxon's statements identifying defendant as the person who killed Haywood. We also conclude the use of those statements at trial was prejudicial error.

### B. *Police Coercion Employed Against Saxon Made His Identification of Defendant Inherently Unreliable.*

█ The statement of a suspect or witness is coerced if it is the product of police conduct which overcomes the person's free will.[20] "[T]he primary purpose of excluding coerced testimony of third parties is to assure the reliability of the trial proceedings. . . ."[21]

Saxon voluntarily complied with a police request to come to the station to be interviewed about the Haywood killing. Before being interviewed by the police, however, he was taken to Youngblood for a polygraph examination.

Youngblood explained to Saxon he was using a "computerized polygraph system" which was "state of the art," "high tech stuff" and as accurate as a calculator. After further explanation of how the machine worked and some preliminary questioning, Youngblood got to the heart of the matter.

"Youngblood: Did you shoot Rabbit?

"Saxon: No.

"Youngblood: Did you shoot Rabbit on Easter Sunday?

"Saxon: No.

"Youngblood: Do you know who shot Rabbit?

"Saxon: No."

---

[19]Saxon testified: "I was scared like they was gonna just charge me with it because they said everybody had an excuse and if I don't tell them what they want me to tell them or better yet just go ahead and say it was Mr. Lee, then, you know, they would let me walk. But instead I would have to spend—I would have to be in jail and miss my son's first birthday and a lot of other things."

[20]*In re Walker* (1974) 10 Cal.3d 764, 777 [112 Cal.Rptr. 177, 518 P.2d 1129].

[21]*People v. Badgett* (1995) 10 Cal.4th 330, 347 [41 Cal.Rptr.2d 635, 895 P.2d 877].

Youngblood then told Saxon to relax while he went to print out the results of the test.

Upon his return, Youngblood once again emphasized the pedigree of the polygraph machine telling Saxon it was "copyrighted by [the] Johns Hopkins University applied physics laboratory—the same people that monitor the spacecraft when they go out and come back in." He then told Saxon according to the machine "the probability of you being the person who shot [Haywood] is 97 percent."[22]

Using this seemingly irrefutable proof of Saxon's guilt as his opening wedge, Youngblood proceeded to threaten Saxon with a first degree murder prosecution unless he identified defendant as the killer. The following excerpts demonstrate the coercion exercised against Saxon.

Youngblood told Saxon: "The worst thing in the world I could do for you now is to give you a fake smile and give you a handshake and tell you we needn't study this further and then turn around and turn this back over to the investigating officers because there's absolutely no doubt in my mind which direction this is going to go. I'm not going to tell you a lie. Sit here and tell you that you are not in trouble. That's bullshit. *First degree murder is a very serious situation.* . . . Did you shoot Rabbit? Did you shoot Rabbit on that Easter Sunday? . . . *When you said 'no,' the computer said it's not true.* There's deception that it's seeing. Okay?" (Italics added.)

"Now, I didn't say what took me so long while I was out of here is that they hadn't given me all the information that they had on this case because they have other evidence and *they have other witnesses that have finally come up and give information that was pointing directly at you.*" (Italics added.)

"I know what direction this thing is about to head, and I'm telling you everything here now before it gets out of hand. And I hope you appreciate what I am doing *because I could walk out of there* [sic] *with those charts, and that's it.*" (Italics added.)

At this point, Youngblood suggested Saxon could avoid being prosecuted for Haywood's murder only if he named defendant as the killer.

Youngblood told Saxon: "There's a lot more to this [than] what you and I talked about. Absolutely no question about it. And I can tell you now, *I know Midnight is involved in it.* Okay? And I'm not guessing, and you know it. . . . So don't blow it now." (Italics added.)

---

[22] The trial court ordered the phrase "97 percent" redacted from the tape and transcript supplied to the jury.

Youngblood then suggested a motive for defendant killing Haywood—one which had never occurred to Saxon:

"Youngblood: Rabbit was the new kid on the block, and he's screwing your homie's old lady. Okay? There is no question in my mind. What is this? What is this? Surprise Midnight?

"Saxon: I didn't know Midnight was still with his old lady.

"Youngblood: Okay. You know what?

"Saxon: No. No. No.

"Youngblood: I'm just saying that's not a surprise to me because why didn't Midnight want this guy dead?

"Saxon: Midnight never really said he wanted him dead, but he said you'll never know.

"Youngblood: Why did Midnight want this guy? That was one of your best friends. Why did Midnight give—why did Midnight want him dead?

"Saxon: That's hard to tell. I don't know."

Following this exchange, Youngblood returned to his theme it was either Saxon or defendant who would be prosecuted for murder, it was up to Saxon to decide.

Youngblood told Saxon: "So right now there's no question in my mind either you are the one that pulled that trigger or Midnight and you pulled that trigger. Okay. What I am going to tell you now, before this thing gets too far out of hand, work with me or work against me. That's where you are, where you are. Now, that's the reality of it." Saxon replied, "I'm with you."

Youngblood kept up the pressure, telling Saxon: "*What we are looking at is first-degree murder*, and I am giving you a chance to say hey, whatever extenuating circumstances that led to that then now is the time to talk to me. If you decide to let it go, then don't blame me for what happens."

Finally, Youngblood gave Saxon an ultimatum and Saxon gave Youngblood the statement he wanted:

"Youngblood: The thing is, you got caught up in the middle of this thing. Okay if you didn't shoot the man yourself. I am going to tell you now I want

everything. *Because if I run you back on this thing again and it still shows that you are the person who shot him, I am going to walk out of here without giving you the results. I will personally write my report today. And turn it in.* Okay? Now, if you did shoot the man, I want to know why and what really happened. So I am asking you now, I don't [care] how scared you are. Did you shoot him?

"Saxon: I didn't shoot him. I know that I can't lie. I did not shoot him.

"Youngblood: But you know who did. And you know what happened out there and you are afraid because somebody is going to put a snitch jacket on you.

"Saxon: *Li'l Midnight shot him.*" (Italics added.)

 California courts have long recognized it is sometimes necessary to use deception to get at the truth.[23] Thus, the courts have held, a "deception which produces a confession does not preclude admissibility of the confession *unless the deception is of such a nature to produce an untrue statement.*"[24] It is also well established exhortations directed to the suspect or witness to "tell the truth" are not objectionable.[25] We apply these same rules to a statement by a witness.[26]

 In the present case, Youngblood went beyond mere deceit as to the evidence pointing to Saxon as the killer. He also went beyond merely exhorting Saxon to tell the truth. He even went beyond threatening Saxon with prosecution for first degree murder unless he named the real killer.

Youngblood in essence told Saxon: We will prosecute you for first degree murder unless you name Midnight as the killer. It was Youngblood, not Saxon, who first brought up defendant's name in connection with the murder.[27] It was Youngblood, not Saxon, who suggested defendant had a motive for killing Haywood. It was Youngblood who told Saxon he possessed polygraph results which showed a "97 percent" certainty Saxon killed Haywood and that if he turned these results over to the investigating officers Saxon would be charged with first degree murder.

---

[23]See, e.g., *In re Walker, supra,* 10 Cal.3d at page 777 (falsely telling suspect he was dying); *People v. Castello* (1924) 194 Cal. 595, 602 [229 P. 855] (falsely telling suspect there were eyewitnesses to the crime); *People v. Watkins* (1970) 6 Cal.App.3d 119, 124-125 [85 Cal.Rptr. 621] (falsely telling suspect his fingerprints were found on the getaway car).

[24]*People v. Watkins, supra,* 6 Cal.App.3d 119, 125 [85 Cal.Rptr. 621], italics added.

[25]*People v. Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].

[26]*People v. Underwood, supra,* 61 Cal.2d at page 124.

[27]Youngblood told Saxon: "I know Midnight is involved in [the killing] . . . and I'm not guessing." He also told Saxon: "[T]here's no question in my mind either you are the one that pulled that trigger or Midnight and you pulled that trigger."

We also note from the transcript of the interrogation Saxon was not *Mirandized* after the police polygraph showed a 97 percent probability he killed Haywood nor was Saxon's claim defendant did the killing subjected to a further polygraph test to determine the claim's credibility. These facts further support our conclusion defendant, not Saxon, was always the target of the interrogation.

Saxon could reasonably conclude from Youngblood's statements the only way to prevent Youngblood from giving the investigating officers the polygraph results which branded him the killer to a "97 percent" certainty was to give Youngblood the "truth" he wanted to hear: that defendant was the killer. The fact Saxon did indeed draw this conclusion is evidenced by his statements to Youngblood the thing he most feared was not being labeled a snitch, but "going to jail for something that I didn't do."

The facts in this case are similar to those in *People v. McClary*,[28] in which the court reversed the defendant's conviction because the police promised the defendant leniency if she would change her story to match the facts represented by the police. One of the officers told defendant: "Unless your story changes to where you can say something else happened and we can prove you true, [*sic*] you're going to be tried [for murder]."[29] The court found "the officers strongly implied that if defendant changed her story and admitted mere 'knowledge' of the murder, she might be charged only as an accessory after the fact."[30]

In the present case, as in *McClary*, the interrogation of Saxon was not designed to produce the truth as Saxon knew it but to produce evidence to support a version of events the police had already decided upon. In this respect, the police crossed the line between legitimate interrogation and the use of threats to establish a predetermined set of facts.[31] The trial court erred in not excluding Saxon's statements.

■ At oral argument in this case the question arose whether a defendant seeking to exclude third party evidence of guilt on the ground the evidence was procured by coercion must separately show the coerced evidence was "unreliable." We granted the parties leave to file letter briefs on this issue. Based on these briefs and our own research we conclude *evidence*[32] which is produced by coercion is inherently unreliable and must be excluded under

---

[28]*People v. McClary* (1977) 20 Cal.3d 218 [142 Cal.Rptr. 163, 571 P.2d 620].

[29]*People v. McClary, supra,* 20 Cal.3d at page 224.

[30]*People v. McClary, supra,* 20 Cal.3d at page 229.

[31]See *People v. Flores* (1983) 144 Cal.App.3d 459, 470 [192 Cal.Rptr. 772].

[32]" 'Evidence' means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." (Evid. Code, § 140.)

the due process clause.[33] There is nothing earthshaking about our conclusion. In *People v. Badgett* our Supreme Court quite clearly stated the exclusion of coerced testimony of a third party "is based on the idea that coerced testimony is *inherently unreliable*, and that its admission therefore violates a defendant's right to a fair trial . . . ."[34] Thus there is no "coercion plus" requirement when, as in the present case, the defendant claims the third party evidence at trial was the direct product of unlawful police coercion.[35]

The rule is different, however, when the defendant claims the evidence at trial was the end product or "fruit" of unlawful police coercion of a third party. As the high court explained in *People v. Jenkins*: "[A] defendant may not prevail simply by alleging that the challenged evidence was the fruit of an assertedly involuntary statement of a third person. . . . Rather, the defendant may prevail only by demonstrating fundamental unfairness at trial, normally *by establishing that evidence to be produced at trial was made unreliable by coercion*."[36]

In *Badgett*, a prosecution witness, Jasik, had made a pretrial statement to the police inculpating the defendant and had agreed to testify for the prosecution under an immunity agreement. The defendant moved to exclude Jasik's *trial testimony* on the ground the pretrial statement was coerced and this coercion would affect Jasik's trial testimony.[37] The court held the exclusion issue must be decided "by focusing on the evidence to be presented at trial, and asking whether *that evidence* is made unreliable by ongoing coercion, rather than *assuming* that pressures that may have been brought to bear at an earlier point ordinarily will taint the witness's testimony."[38]

In *Jenkins*, the court applied *Badgett* to a case in which the defendant claimed physical evidence and fourth party testimony should be excluded

---

[33]*People v. Jenkins* (2000) 22 Cal.4th 900, 966-967 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Badgett, supra*, 10 Cal.4th at page 347.

[34]*People v. Badgett, supra*, 10 Cal.4th at page 347.

[35]Nor did *Badgett* break new ground. Earlier, the court had held in *People v. Douglas* (1990) 50 Cal.3d 468, 500 [268 Cal.Rptr. 126, 788 P.2d 640] the exclusion of coerced third party testimony "is based on the idea that coerced testimony is inherently unreliable[.]"

[36]*People v. Jenkins, supra*, 22 Cal.4th at page 966, italics added. The reason why the rule is different is because the purpose of excluding coerced statements by third parties is to protect the defendant's right to due process, not his privilege against self-incrimination. As stated in *Badgett*: "There is no·danger that through the testimony of a third party, the burden of proof imposed on the state will be lightened. Thus, the principal reasons for excluding evidence taken in violation of the privilege against self-incrimination, including successive, involuntary statements is simply not applicable in this instance." (*People v. Badgett, supra*, 10 Cal.4th at p. 347.)

[37]*People v. Badgett, supra*, 10 Cal.4th at page 345.

[38]*People v. Badgett, supra*, 10 Cal.4th at pages 347-348.

because they were discovered as the result of unlawful police coercion of a third party, Moody. Moody did not testify nor did the prosecution introduce evidence of his allegedly coerced statement to the police. The court stated, "We detect no connection between the asserted coercion of Moody . . . and *the reliability of the Woodsons' testimony at trial, or of the murder weapon or the vehicle, as evidence of defendant's guilt.*"[39]

To reiterate. When the defendant seeks to exclude third party evidence he must show the specific evidence to be excluded was unlawfully coerced from the third party, not merely that the evidence is the fruit of unlawful coercion. Thus, as in the present case, when the defendant seeks to exclude a third party's pretrial statement which was obtained through unlawful police coercion the defendant need only prove the unlawful coercion. If he does so, the evidence is deemed "inherently unreliable."[40] But when the defendant seeks to exclude evidence which is at most the fruit of unlawful coercion, e.g., a murder weapon discovered as the result of unlawful coercion of a third party, the defendant must show some connection between the coercion and the evidence to be excluded which makes the evidence unreliable.[41]

### C. *The Error Was Prejudicial Beyond a Reasonable Doubt.*

 Without Saxon's identification of defendant as the killer, the People's evidence against defendant was slim.

The People attempted to show opportunity through evidence, albeit contradicted, defendant was on the second-floor balcony of the apartment building 10 or 15 minutes before the shooting looking down at the dice game with an angry look on his face. The problem with this attempt to link defendant to the shooting is that the evidence showed there were approximately a dozen other residents or guests who also watched the dice game at one time or another and who were much closer to the participants than defendant.

On the subject of motive, the prosecution dropped the jealousy theory and instead adopted the theory defendant killed Haywood because Haywood had "dis'd" him (i.e., disrespected him).

Heather Sugars testified she was in an apartment with defendant when he became upset about the quality of some drugs she had obtained for him through another. As Sugars left the apartment with her back turned toward defendant she heard a shot and a shell casing hit her in the back of the head.

---

[39]*People v. Jenkins, supra,* 22 Cal.4th at pages 967-968.
[40]*People v. Badgett, supra,* 10 Cal.4th at page 347.
[41]*People v. Jenkins, supra,* 22 Cal.4th at page 966.

Defendant immediately apologized and said the gun went off accidentally. Sugars told Haywood about the incident the next day and Haywood went to talk to defendant about it.

Sugars's mother, Forrest Ney, testified defendant was in her apartment the following day and she heard him say, "My homeboys dis'd me and I got to do something about it." In her statement to the police following the shooting Ney quoted defendant as saying: "I hate doing it, but one of my homies did something wrong and dis'd me and I gotta 'im [*sic*]. I don't care how wrong it is. I gotta do dirt."

Ney further testified, however, defendant never stated who disrespected him, never described the person or persons, never said how he was disrespected or when.

The People also introduced a statement from a another purported witness to the murder who stated defendant did the shooting and a statement by defendant purportedly admitting to the crime.

Rhonda Thompson, who lived in the apartment building, testified that immediately after the shooting she saw Nicole Davis "running toward Rabbit [and] screaming and hollering saying Midnight done shot this boy." Thompson then heard defendant say, "Nobody better say I did this shooting."

Thompson's testimony, however, was contradicted by three other witnesses who testified Davis was with them inside one of the apartments when the shooting took place. It was impossible to see the area where the shooting occurred from the apartment and none of the three witnesses heard Davis say defendant shot Haywood or saw her run out of the apartment. Furthermore, Davis denied she ever stated defendant shot Haywood and confirmed she was inside an apartment with the others when the shooting took place. Finally, none of the other witnesses confirmed Thompson's testimony that immediately after the shooting defendant stated no one should say he did it. Even if defendant did make this statement, its meaning is ambiguous. The statement could have been intended as a threat or it could have been intended as a disavowal of any involvement in the crime.

Given the dearth of other evidence of defendant's guilt, we are unable to state the trial court's error in admitting Saxon's coerced statements to the police was harmless beyond a reasonable doubt.[42]

---

[42]*Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].

### III. The Trial Court Committed Prejudicial Error in Admitting the Results of Saxon's Polygraph Examination.

■ As an alternative, independent and sufficient ground for reversing defendant's conviction we hold the trial court committed prejudicial error in allowing the jury to hear a tape recording of Saxon's polygraph examination and Youngblood's subsequent interrogation based on the results of the examination.

Evidence Code section 351.1, subdivision (a) states in relevant part: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to . . . [the] taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding . . . ." This rule does not exclude from evidence statements made during a polygraph examination if they are otherwise admissible.[43]

Over defendant's objection, the trial court permitted the prosecutor to play the tape recording of Saxon's polygraph examination followed by Youngblood's interrogation of Saxon based on the results of the examination.[44] In the examination, Youngblood asked Saxon if he shot Rabbit and if he knew who did. Saxon answered no to both questions. After obtaining the results of the examination Youngblood told Saxon the word "deception" means lying and "this [machine] is saying that a deception has been indicated and the probability of deception is . . . pretty high."[45] Youngblood also informed Saxon the results of the polygraph examination showed "the probability of you being the person who shot Rabbit [redacted]."

These and similar statements on the tape were inadmissible under Evidence Code section 351.1, subdivision (a) because they referred to Saxon taking a polygraph test, the results of the test, and Youngblood's opinion as to Saxon's truthfulness.

The People argue references to the polygraph test, its results, and the examiner's opinion were admissible despite the plain language of the statute and, in any event, their admission was harmless error.

The People contend evidence relating to Saxon's polygraph test was admissible because it was not offered to show the truth or falsity of Saxon's

---

[43]Evidence Code section 351.1, subdivision (b).

[44]See pages 784-788, ante.

[45]The trial court only redacted from the tape and the written transcript Youngblood's statement the probability of deception was "97 percent."

answers or for its probative value in establishing defendant's guilt. Rather, it was offered for the collateral purpose of showing Saxon's state of mind when he changed his story and admitted seeing defendant shoot Haywood.

We find this argument unpersuasive for several reasons. It is disingenuous to argue the polygraph evidence was not offered to establish defendant's guilt. If it was not offered for that purpose then it was irrelevant. Clearly, however, the prosecution introduced the evidence because it wanted the jury to believe the test results, which showed Saxon lied when he said he did not know who shot Haywood so that the jury would also believe he was telling the truth when he said defendant shot Haywood. Furthermore, there is no "state of mind" exception to the ban on polygraph evidence. Unlike hearsay evidence, which is only banned if it is offered "to prove the truth of the matter stated,"[46] polygraph evidence "shall not be admitted into evidence in any criminal proceeding."[47] Finally, whatever may have been the law on the collateral use of polygraph evidence prior to 1983,[48] Evidence Code section 351.1 simply and unambiguously prohibits the admission of evidence that a person took a polygraph test.

The error in admitting the polygraph evidence was not cured by the limiting instruction the trial court gave the jury. The court instructed: "Polygraph results are not admissible. You are not to discuss or consider the subject of polygraph, how it works [or] any facts relating to polygraph examination. Polygraph examination has been admitted in this court for the limited purpose of showing the effect of the knowledge of a polygraph test on the listener, who is Reynard Saxon. You are not to consider the polygraph results for any other purpose."

The trial court apparently attempted to avoid the statutory ban on evidence of polygraph results by having the jury focus not on the results but on their "effect" on Saxon. Obviously, the effect of the test results was to cause Saxon to name defendant as the killer after previously denying any knowledge about who killed Haywood. It is impossible in this case to separate the inadmissible "results" of the polygraph test from their "effect" on Saxon. Thus, the jurors were permitted to infer Youngblood's "high tech" polygraph caught Saxon in a lie and caused him to abandon the lie and tell the truth—that defendant was the killer. This was tantamount to receiving into evidence the results of the polygraph examination. Its probable impact on

---

[46]Evidence Code section 1200, subdivision (a).

[47]Evidence Code section 351.1, subdivision (a).

[48]See *People v. Lara* (1974) 12 Cal.3d 903, 909 [117 Cal.Rptr. 549, 528 P.2d 365] (for purposes of establishing probable cause for arrest, police officer could testify the fact the witness took a lie detector test substantiated his belief in the credibility of the witness's story).

the jury was to place the badge of credibility on Saxon's postpolygraph statements to the police incriminating defendant, assuming they were admissible.[49]

The error was prejudicial. We have already pointed out the weakness of the prosecution's case absent Saxon's statement blaming the murder on defendant. The polygraph evidence lent an unreasonable impression of credibility to that statement. ■ Polygraph evidence is inadmissible because of the lack of scientific certainty about the results[50] and also because lay persons tend to invest such evidence with an inordinately high degree of authority.[51] ■ In the present case, the jurors heard nothing about the lack of scientific support for polygraph results but they did hear Youngblood describe his machine as a piece of space age technology, as reliable as a calculator, "state-of-the-art," "high tech stuff," and "copyrighted by [the] Johns Hopkins University applied physics laboratory . . . the same people that monitor the spacecraft." For these reasons, we find it is reasonably probable that without the inadmissible polygraph evidence the jury would have reached a result more favorable to the defendant.[52]

## DISPOSITION

The judgment is reversed.

Woods, J., and Boland, J.,* concurred.

On February 20, 2002, the opinion was modified to read as printed above.

---

[49]Cf. *People v. Andrews* (1970) 14 Cal.App.3d 40, 45 [92 Cal.Rptr. 49] (error to admit evidence the charges against a key prosecution witness were dropped after he took a lie detector test even though results of the test not mentioned).

[50]*People v. Jones* (1959) 52 Cal.2d 636, 653 [343 P.2d 577].

[51]*People v. Aragon* (1957) 154 Cal.App.2d 646, 658 [316 P.2d 370].

[52]*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

*Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.