Filed 4/3/13  P. v. Alcaraz CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B236508 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA057694) |
| v. | |
| STEVEN HECTOR ALCARAZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel B. Feldstern, Judge.  Remanded and modified in part with directions, otherwise affirmed.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

A jury convicted Steven Hector Alcaraz (defendant) of second degree murder (Pen. Code,[1] § 187, subd. (a)) (count 1) and shooting at an occupied vehicle (§ 246) (count 5). The jury acquitted defendant of three counts of attempted murder (§§ 664, 187, subd. (a)) (counts 2, 3, 4). The jury found as to counts 1 and 5: a principal personally and intentionally discharged a firearm proximately causing death (§ 12022.53, subds. (d) & (e)(1)); and the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd (b)(1)(C)). Defendant was sentenced to 65 years to life in state prison. This was the third time defendant was tried for these crimes. We remand for resentencing as to count 5 and certain other modifications, and otherwise affirm the judgment.

## II. THE EVIDENCE

We view the evidence in the light most favorable to the verdict. (*People v. Griffin* (2004) 33 Cal.4th 1015, 1028; *People v. Barnes* (1986) 42 Cal.3d 284, 303.) Defendant participated in a gang-related assault on September 22, 2006. He was driving in his home neighborhood when he saw a GMC Yukon occupied by Javier Nuno, Jr., his brother, Fernando Nuno, Javier's[2] girlfriend, Janett Ramirez, and their 13-month-old daughter, Elisa Nuno. Defendant telephoned his brother, Andrew Alcaraz, and told him the location of the vehicle. Defendant encouraged his brother to "go get them" and to "blast them." Andrew Alcaraz and two fellow gang members pursued the Nunos. One of the three repeatedly fired a weapon at the vehicle occupied by the Nunos. Fernando was killed.

---

[1]    All further statutory references are to the Penal Code unless otherwise noted.

[2]    To avoid confusion, we refer to members of the Nuno family by their first names.

## III.  DISCUSSION

### A.  The False Representation Evidence

An eyewitness, Jair Gonzalez, implicated defendant in the shooting.  Mr. Gonzalez testified at the preliminary hearing and at trial under immunity.  Mr. Gonzalez was with defendant when defendant encouraged his brother to assault the occupied vehicle. Detective Terence Keyzer interviewed defendant extensively and on several occasions in the month after the assault.  Defendant's story repeatedly changed.  During a telephone conversation between Detective Keyzer and defendant, who was then in Arizona, Detective Keyzer told defendant what he had learned from Mr. Gonzalez.  Detective Keyzer told defendant Mr. Gonzalez had taken a lie detector test.  That statement was untrue.  Defendant then offered to also take a lie detector test.  The trial court redacted all references to a lie detector test.

The pertinent conversation was as follows:  "Detective Keyzer:  [Mr. Gonzalez is] not making it up.  I put him on a lie detector, okay?  I put him on - - on the polygraph. He's not making it up.  [¶]  [Defendant]:  Well, you could put me on one too.  [¶] Detective Keyzer:  Well, when are you coming down?  Let's do it.  [¶]  [Defendant]: Fuck, inaudible.  [¶]  Detective Keyzer:  Exactly.  Listen to me.  [¶]  [Defendant]:  I can't just fucking get up and leave.  [¶]  Detective Keyzer:  Why?  You did that in California. [¶]  [Defendant]:  Yeah, I don't have no way to get - - get back.  [¶]  Detective Keyzer: Listen to me.  [¶]  [Defendant]:  I came up here with my mom.  [¶]  Detective Keyzer: Listen.  [¶]  [Defendant]:  Yes."  That conversation was redacted from the evidence presented to the jury.  Defendant subsequently said, "I mean, fucking, - - I mean, if you guys need me to really fucking go down there and talk to you guys, I mean, *to get myself situated, a lie detector test* or whatever . . . I'll do it."  The italicized portion of defendant's statement was also redacted.  Defendant argues the redactions were error resulting in a violation of his constitutional rights.  He asserts the ruse by Detective Keyzer—that Mr. Gonzalez took and impliedly passed a lie detector test—should have

3

been allowed in evidence for the effect it had on the voluntariness and accuracy of defendant's subsequent admissions.

There was no error and no violation of defendant's constitutional right to present a defense. Evidence Code section 351.1, subdivision (a) states: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results." There are no exceptions to Evidence Code section 351.1. (*People v. McKinnon* (2011) 52 Cal.4th 610, 663; *People v. Samuels* (2005) 36 Cal.4th 96, 128; *People v. Wilkinson* (2004) 33 Cal.4th 821, 845-846.) "The state's exclusion of polygraph evidence is adorned with no exceptions, and its stricture on admission of such evidence has been uniformly enforced by this court and the Court of Appeal. [Citations.]" (*People v. McKinnon, supra,* 52 Cal.4th at p. 663; accord, *People v. Samuels, supra,* 36 Cal.4th at p. 128; *People v. Wilkinson, supra,* 33 Cal.4th at pp. 845-846.) Excluding polygraph evidence under section 351.1 does not violate a defendant's constitutional right to present a defense. (*People v. Wilkinson, supra,* 33 Cal.4th at pp. 848-852; *People v. Maury* (2003) 30 Cal.4th 342, 413.)

Moreover, there is no state-of-mind exception to Evidence Code section 351.1. (*People v. McKinnon, supra,* 52 Cal.4th at pp. 662-664; *People v. Lee* (2002) 95 Cal.App.4th 772, 790-791.) In *McKinnon*, the trial court admitted evidence an eyewitness was told he had lied during a polygraph examination. The evidence was admitted to explain why the witness subsequently ceased denying knowledge of a murder and implicated the defendant as the perpetrator. Our Supreme Court held the trial court erred; there was no state-of-mind exception to Evidence Code section 351.1. (*People v. McKinnon, supra,* 52 Cal.4th at pp. 662-664.) In *Lee,* the trial court admitted a tape recording of a witness's polygraph examination and subsequent interrogation to show its effect on the witness. Prior to the polygraph test, the witness denied any knowledge of the crime. Following administration of the test, the witness changed his story and admitted seeing the defendant shoot the victim. (*People v. Lee, supra,* 95 Cal.App.4th at

4

pp. 790-791.) The Court of Appeal for this appellate district held: "[T]here is no 'state of mind' exception to the ban on polygraph evidence. Unlike hearsay evidence, which is only banned if it is offered 'to prove the truth of the matter stated,' polygraph evidence 'shall not be admitted into evidence in any criminal proceeding.' . . . [S]ection 351.1 simply and unambiguously prohibits the admission of evidence that a person took a polygraph test." (*People v. Lee, supra,* 95 Cal.App.4th at p. 791, fns. omitted.) Here, defendant argues the polygraph test evidence was admissible to show its effect on him in light of his subsequent statements to Detective Keyzer. This case is controlled by the statute as interpreted in *McKinnon* and *Lee.* The trial court properly excluded the evidence.

Even if the trial court erred in excluding the evidence, the error was harmless under any standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. McKinnon, supra,* 52 Cal.4th at p. 665 [harmless under any standard]; *People v. Lee, supra,* 95 Cal.App.4th at p. 792 & fn. 52 [applying *Watson*].) Mr. Gonzalez, an eyewitness, implicated defendant in the shootings. Mr. Gonzalez's testimony was corroborated in large part by defendant's own admissions. As noted above, Detective Keyzer interviewed defendant extensively and on repeated occasions in the month following the shooting. Defendant made incriminating statements both before and after Detective Keyzer briefly mentioned Mr. Gonzalez's purported polygraph examination. At first, defendant denied any involvement in the assault. He also denied his brother Andrew was in the shooter's car. Defendant subsequently admitted he was speaking to his brother Andrew on the telephone around the time the assault occurred, but denied their conversation had anything to do with the victims. Eventually, defendant admitted his brother was in the assailant's vehicle. He further admitted telling his brother the location of the victims' car.

Detective Keyzer repeatedly challenged defendant's version of the facts. He told defendant that other people had told him Andrew was involved in the shooting. He told defendant he had telephone records showing defendant was talking to his brother on the

5

night of the shooting.  Detective Keyzer said that based on the telephone records, he knew Andrew was in the shooter's car.

The jury had before it evidence of the evolving conversations between defendant and Detective Keyzer.  The jury could assess for itself the effect of Detective Keyzer's tactics on defendant's subsequent statements.  In the context of the ongoing conversation between the detective and defendant, and the evidence as a whole, the effect of Detective Keyzer's polygraph ruse on defendant's admissions was remote.  There is no likelihood the jury, knowing of the polygraph ruse, would have found defendant's admissions were coerced untruths or otherwise found more favorably to him.

### B.  The Mexican Mafia Evidence

### 1.  The testimony

The Mexican Mafia was a prison gang that oversaw all Hispanic gangs in Southern California.  The Mexican Mafia was known to issue "green light" orders in certain circumstances and to keep green light lists.  A green light meant the Mexican Mafia had targeted a person for harm, usually murder.  Mr. Gonzalez (who implicated defendant in the assault) had ties to the Mexican Mafia.  One day prior to Fernando's murder, Javier and Fernando instigated a fight in Mr. Gonzalez's front yard.  The Nunos brothers' father, Javier Nuno, Sr. ("Quintero"), also engaged in the fight.  Their uncle, Sergio Nuno, was the driver.  He remained in his car.  During the altercation at the Gonzalez home, weapons were drawn.  Young children were present.  This "disrespect" led the Mexican Mafia to issue a green light against Javier, Fernando and Quintero.  The green light resulted in Fernando's murder.  In a conversation with Detective Keyzer, defendant identified the incarcerated Mexican Mafia member who ordered the green light.

Sergio was defendant's friend as well as the victim's uncle.  The prosecution sought to explain defendant's participation in the present offenses despite his friendship

6

with Sergio.  The prosecution reasoned:  a green light had earlier been issued against defendant for his undisputed, repeated cooperation with law enforcement, that is, for being a "snitch";  and by carrying out the Mexican Mafia's green light against members of the Nuno family, defendant hoped to have his own green light extinguished.

The evidence raised several questions about how and why green lights were issued.  Was disrespecting a Mexican Mafia member's home a reason to issue a green light?  Could a green light against the Nunos have been issued between the fight at the Gonzalez home and the next day's shooting?  Would a green light issue against a snitch?  And if so, could the target extinguish it by executing a green light against another gang member?

Gang experts for the prosecution—Detective Gutierrez—and for the defense—Alex Alonso—each discussed the manner in which a green light issues.  Both agreed that a green light *could* issue against a person who disrespected the home of a Mexican Mafia member's family.  Detective Gutierrez, however, had not heard of it being done.  Detective Gutierrez testified that, in general, the consent of at least two Mexican Mafia members was required to approve a green light.  But, "[A] green light can be approved as quick as a phone call."  Detective Gutierrez had once heard of a green light against a gang being lifted after the gang's members participated in a hit on two rival gang members.  Depending on the severity of the transgression, a person's name could be removed from a green light list.  Other green lights were permanent until death.  A person could get off a green light list by making amends—for example, by committing a crime for the prison gang or by paying money owed.

Testifying for the defense, Mr. Alonso said a high-ranking Mexican Mafia member could order a green light against an individual without input from others.  The length of time required to secure a green light depended on the speed at which necessary communications could occur.  It could take several days.  The heightened surveillance of Mexican Mafia members in custody could delay the response time.  A turnaround time of 36 hours would be "pretty quick."  There were circumstances in which a green light could be lifted.  But Mr. Alonso had never heard of a green light being lifted once issued

7

against a snitch. He had never heard of a green light against a snitch being lifted after the target participated in killing another snitch. If the Mexican Mafia learned a gang member told law enforcement officers a named Mexican Mafia member had ordered a green light, the snitch would be targeted for murder.

Defendant testified in his own defense. He said he did not believe it was possible for his own green light to be lifted by assaulting the Nunos.

## 2. The proposed testimony

Defendant's attorney, Jonathan Mandel, sought to call Charles Marquez, a prison inmate and former Mexican Mafia member, to testify about green lights. Mr. Mandel made the following offer of proof. Mr. Marquez had been a member of the Mexican Mafia for 15 to 20 years. He would testify that green lights take one to two weeks to issue and require the assent of more than one member. It was possible but unlikely a green light would issue for disrespecting a Mexican Mafia member's family home. The Mexican Mafia prefers not to issue green lights because of personal vendettas. Further, a snitch cannot extinguish a green light by making amends. And if defendant told law enforcement officers a named Mexican Mafia member had ordered a green light, defendant would be subject to the most powerful green light; the sanctions against him would be "astronomical."

Mr. Mandel conceded his request to call Mr. Marquez as a witness was untimely. Mr. Mandel had not given notice 30 days prior to trial that he intended to call Mr. Marquez as a witness, as required by sections 1054.3 and 1054.7.

## 3. The trial court's ruling

The trial court ruled the proposed testimony was cumulative. The points Mr. Mandel sought to make had already been brought out by both defense and prosecution gang experts. The trial court further noted it was not until the first day of trial that Mr.

8

"Mandel gave any indication he might want to call this witness. Now, at the end of the trial, Mr. Mandel had finally interviewed the potential witness for the first time, and for only 10 or 15 minutes. This was an old case and the issues had been known to everyone for a long time. Mr. Mandel conceded his request was untimely. Because the request to call the witness was not made within the parameters of section 1054.7, and because the proposed testimony was cumulative, the trial court denied the defense request to call Mr. Marquez as a witness.

### 4. There was no abuse of discretion

Our review is for an abuse of discretion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, disapproved on a different point in *People v. Rundle* (2008) 43 Cal.4th 76, 151; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) As our Supreme Court held in *Guerra,* "[A] trial court's [admissibility] ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. [Citation.]" (*People v. Guerra, supra,* 37 Cal.4th at p. 1113, quoting *People v. Rodriguez, supra,* 20 Cal.4th at pp. 9-10; accord, *People v. Hartsch* (2010) 49 Cal.4th 472, 497.) There was no abuse of discretion. As Mr. Mandel conceded, the request to call Mr. Marquez as a witness was untimely. Further, the proposed testimony was cumulative. Detective Gutierrez and Mr. Alonso had already testified to the points Mr. Mandel sought to prove by calling Mr. Marquez as a witness.

### C. Sentencing

### 1. Section 654

Defendant argues the imposition of concurrent terms on counts 1 and 5 violated section 654; he asserts the sentence on count 5 must be stayed. That contention is

9

without merit.  There were four people in the vehicle when defendant's fellow gang member fired multiple gunshots at it.  One person died.  Under the multiple victims exception to section 654, defendant was properly punished for both second degree murder and shooting at an occupied vehicle.  (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1780-1785; *People v. Gutierrez* (1992) 10 Cal.App.4th 1729, 1736-1737; *In re Sergio R.* (1991) 228 Cal.App.3d 588, 598; *People v. Masters* (1987) 195 Cal.App.3d 1124, 1127-1128.)

## 2.  Section 12022.53, Subdivision (e)(2)

Defendant asserts and the Attorney General concedes that it was error to sentence defendant on count 5 to a concurrent indeterminate life term under section 186.22, subdivision (b)(4)(B) and also impose a consecutive 25-year-to-life enhancement under section 12022.53, subdivisions (d) and (e)(1).  We agree.  (§ 12022.53, subd. (e)(2); *People v. Brookfield* (2009) 47 Cal.4th 583, 595; *People v. Gonzalez* (2010) 180 Cal.App.4th 1420, 1424-1425; *People v. Salas* (2001) 89 Cal.App.4th 1275, 1281-1282.)  The 15-year-to-life sentence on count 5 must be reversed.  (*People v. Brookfield, supra,* 47 Cal.4th at p. 596.)  On remand, the trial court must select the base term for felony shooting at an occupied vehicle, 3, 5 or 7 years.  (§ 246.)

The trial court stayed section 12022.53, subdivisions (b) and (c) enhancements as to both counts under subdivision (f) of that section.  Those orders are reflected in the abstract of judgment.  We asked the parties to brief the questions whether: as to count 5, it was error to stay the enhancements as the jury did not return true findings as to any section 12022.53, subdivisions (b) or (c) allegations; and the trial court was required to orally *impose* and then stay the section 12022.53, subdivision (b) and (c) enhancements on count 1.  The judgment must be modified to strike the stayed section 12022.53, subdivisions (b) and (c) enhancements as to count 5.  The oral pronouncement of judgment must be modified to impose and then stay the enhancements as to count 1.  (§ 12022.53, subd. (f); *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1122-1123, 1130.)

10

### 3.  Presentence Custody Credit

Defendant argues and the Attorney General concedes that the matter must be remanded for a recalculation of defendant's presentence custody credit.  The trial court awarded defendant credit for 1,426 days in presentence custody.  However, defendant was arrested on January 21, 2007,  and sentenced on October 5, 2011,  a period totaling 1,719 days.  In addition, the trial court did not include time spent in custody in Arizona awaiting extradition to California.  We have no record before us of the time defendant spent in custody in Arizona.  Defendant's presentence custody credit award is erroneous.  On remand, the trial court must recalculate defendant's presentence custody credit to include all time spent in custody in Arizona awaiting extradition and in California after extradition.

### 4.  Court Facilities Assessment

The trial court imposed a $30 court facilities assessment.  (Gov. Code, § 70373, subd. (a)(1).)  We asked the parties to brief the question whether the trial court should have imposed the court facilities assessment as to each count.  (*People v. Castillo* (2010) 182 Cal.App.4th 1410, 1415, fn. 3.)  The judgment must be modified to impose and the abstract of judgment amended to reflect a $30 court facilities assessment as to each count for a total of $60.  (*Ibid.*)

### 5.  The Abstract of Judgment

The trial court imposed a $40 court security fee (§ 1465.8, subd. (a)(1)) as to each count for a total of $80.  The abstract of judgment incorrectly records the amount as $40.  The abstract of judgment must be corrected to reflect the court security fees totaling $80.  In addition, the abstract of judgment erroneously reflects a *concurrent* 25-year-to-life sentence under section 12022.53, subdivisions (d) and (e)(1), on count 5.  The trial court

11

properly imposed a *consecutive* 25-year-to-life sentence. (§ 12022.53, subds. (d) & (e)(1).)  The abstract of judgment must be corrected to reflect a consecutive 25-year-to-life sentence under section 12022.53, subdivisions (d) and (e)(1), on count 5.  (See *People v. Acosta* (2002) 29 Cal.4th 105, 110 ["the [trial] court should . . . ensure that the abstract of judgment is correct"].)

## IV.  DISPOSITION

The 15-year-to-life sentence on count 5, shooting at an inhabited vehicle, is vacated.  The cause is remanded for resentencing as to count 5, and amendment of the abstract of judgment as follows.  The trial court is directed to:  select a determinate base term for count 5; impose a  consecutive 25-year-to-life sentence under Penal Code section 12022.53, subdivisions (d) and (e)(1) on count 5; strike the Penal Code section 12022.53, subdivisions (b) and (c) enhancements on count 5; impose and then stay the Penal Code section 12022.53, subdivisions (b) and (c) enhancements on count 1; recalculate defendant's presentence custody credit to include all time spent in custody in Arizona awaiting extradition and, subsequently, in California; impose Penal Code section 1465.8, subdivision (a)(1) court security fees totaling $80; impose Government Code section 70373, subdivision (a)(1) court facilities assessments totaling $60.  In all other respects, the judgment is affirmed.

O'NEILL, J.*

We concur:

ARMSTRONG,  ACTING P.J.

KRIEGLER   , J.

---

*       Judge of the Ventura County Superior Court, assigned by the Chief Justice
pursuant to article I, section 6, of the California Constitution.