Filed 4/17/13  P. v. Turner CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHARLES TURNER,<br><br>        Defendant and Appellant. | A132790<br><br>(Contra Costa County<br>Super. Ct. No. 05-100136-1) |

In the early morning hours of November 7, 2009, Lathel Douglas, Jr., was shot and wounded in front of his father's home in North Richmond.  His father, Lathel Douglas, Sr., was shot and killed.[1]  Appellant Charles Turner was convicted by jury of the second degree murder (Pen. Code, § 187)[2] of Douglas Sr. and attempted voluntary manslaughter (§§ 192, 664) of Douglas Jr.  Turner was sentenced to a term of 47 years to life in state prison.  On appeal, Turner contends that:  (1) certain of Douglas Jr.'s statements to police were coerced and that their admission at trial violated Turner's right to a fair trial; and (2) that the trial court violated Turner's due process rights by misinstructing the jury on use of evidence of other offenses to prove identity (CALCRIM No. 375).  We affirm.

---

[1] To avoid confusion, we refer to the victims as Douglas Sr. and Douglas Jr.

[2] All further section references are to the Penal Code unless otherwise indicated.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

Turner was charged, by information, with the murder of Douglas Sr. (§ 187; count one), the attempted murder of Douglas Jr. (§§ 187, 664; count two), and second degree robbery (§§ 211, 212.5; count three).  The information further alleged that, in the commission of all three offenses, Turner intentionally and personally discharged a firearm, causing great bodily injury or death (§ 12022.53, subd. (d)).

Prosecution's Case

*The Involved Parties*

Douglas Sr. lived at 1729 First Street in North Richmond.  Douglas Jr. had lived in the house with his father and uncle, but moved out when his father got married.  After moving out, Douglas Jr. continued to keep some clothing and personal effects at his father's house.

Douglas Jr. knew Quianna Moore from high school.  The two were friends, but not romantically involved.  Moore was a heavy drug user, and Douglas Jr. had both sold drugs to her and used drugs with her.

Douglas Jr. did not really know Vanessa Perez, but had seen her around the projects.  Perez had lived in North Richmond for several years prior to the shooting.  She had been living with her mother in an apartment in the public housing projects on West Ruby Street, until about five months before the shooting, when she moved in with a girlfriend on First Street.  Perez met Turner, whom she knew as "Noony," in late 2008, when he visited a cousin who lived in the unit next door to Perez's mother.  Perez met Moore through Turner.  In September 2008, Turner and Moore had a child together.

*Douglas Jr.'s Testimony*

Douglas Jr. testified that, on November 6, 2009, he was driving past the West Ruby Street projects, where he saw Moore and Perez.  Moore spotted Douglas Jr. and waved him over.  Douglas Jr. needed gas money and asked Moore if she wanted to buy a $10 bag of marijuana.  Moore agreed, but said she needed a ride to a nearby house to get the money.  Moore got into the car, while Perez stayed behind.

Moore directed Douglas Jr. to a house nearby on Warren Street, which was around the corner from Douglas Sr.'s home on First Street. She went inside to get the money while Douglas Jr. waited in the car. After a few minutes, Moore hurried out of the house and got into the car. She was agitated. She said, "he's comin'," and urgently told Douglas Jr. to "drive off."

As Douglas Jr. made a u-turn, he saw "[s]ome dude" he did not know approach. The man pointed a handgun at Douglas Jr. and told him to stop the car. Two other men were off to the side. The man with the gun walked around to the passenger side and told Moore to get out of the car. Moore refused. Douglas Jr. told Moore, "the dude got a gun. Open the door." When Moore still did not open the door, Douglas Jr. reached across Moore and opened her door.[3]

Douglas Jr. asked what was going on. The man responded: " 'It has nothing to do with you.' " Douglas Jr. tried to explain that he and Moore were not involved; as he put it, "[Moore was] actually trying to get high." This explanation made the armed man angrier. He began swearing at Moore, telling her she was not supposed to get high. He also said something like, "this is my kid." Moore still refused to get out of the car. After five minutes, the man said, "forget it," shut the car door, and walked off.

Douglas Jr. drove up the street a block, pulled over, and asked Moore to get out of the car because he did not want trouble. Moore responded that she still wanted to buy marijuana, and if he waited a few minutes, she would run back to the house to get $10. Douglas Jr. needed gas money in order to get to his son's birthday party and he reluctantly agreed. Moore returned a few minutes later with the cash, and Douglas Jr. gave her a small bag of marijuana. He then drove Moore back to the West Ruby Street projects.

There, they again met up with Perez. Perez joined them in the car. Douglas Jr. agreed to give Moore and Perez a ride to San Pablo since he was heading to Pinole.

---

[3] The passenger door of Douglas Jr.'s car was defective and required a special maneuver to open it.

Along the way, the three stopped by a gas station and smoked marijuana.[4]  Douglas Jr. then dropped the women off at Moore's friend's home in San Pablo.  Douglas Jr. went to his son's birthday party in Pinole.

Later that evening, Moore called Douglas Jr. for a ride home.  He picked up the women, and they went to another house where they "got high some more."  Douglas Jr. commented that he needed to get his hair twisted again, and Moore offered to twist his braids for him.  Douglas Jr. drove the women to his father's home on First Street where he kept his hair products.

Douglas Jr. arrived at his father's house after 1:00 a.m., and backed his car into the driveway.  He called his father on his cell phone to let him in.  Douglas Jr. went inside the house for several minutes while the women waited in the car.  Perez was in the back seat and Moore was in the front passenger seat.  Douglas Jr. returned and put his hair products in the car.  As Douglas Jr. started to get in the driver's side of the car, he heard the sound of someone coming up behind him.  He looked up and saw "[s]ome dude in a hood" approaching with a gun in his hand.  A second man was standing nearby, about a car length away.

The armed man went around to the passenger side, opened the passenger door, and started arguing with Moore, telling her to get out.  Not wanting a commotion outside his father's house late at night, Douglas Jr. told Moore:  "Get the fuck up off my car with this shit."  Immediately thereafter, the man raised the gun and shot Douglas Jr. in the neck.[5]  Douglas Jr. spun around and fell to the ground next to his car, where he played dead.  Both men came around to the driver's side and went through Douglas Jr.'s pockets, taking his wallet.  Douglas Jr. still had his cell phone in his hand.  He called his father and whispered into the phone that he had been shot.

---

[4] Douglas Jr. was already high on methamphetamine at the time.

[5] On cross-examination, Douglas Jr. testified somewhat differently.  He said that, before the shooting, the armed man asked Douglas Jr., " 'What are you doing with this bitch?' "  Douglas Jr. responded:  " 'What are you talking about?' "  The man repeated his question, and before Douglas Jr. could respond, the man shot him.

Douglas Jr. did not see his father come outside. However, as Douglas Jr. was laying on the ground, he heard the gate open and heard Douglas Sr. say, "Hey little nigga." Then, Douglas Jr. saw the man who had shot him extend his right arm and heard the man fire three shots at Douglas Sr. He did not see the gun. Immediately after the three shots were fired, the armed man fled the scene.

Douglas Jr. ran across the street to his neighbor's house and frantically asked him to call an ambulance for his father. The police were dispatched to the scene at 1:25 a.m., and arrived within a few minutes. Douglas Jr. was taken, by ambulance, for treatment. Douglas Sr. suffered gunshot wounds to the chest and the foot and was pronounced dead at the scene.

At trial, Douglas Jr. denied knowing the shooter's identity and denied ever telling the police that Turner was the shooter. He also testified that the shooter was not the same person who confronted him and Moore with a gun on Warren Street. The two men had different body types and voices. They were also wearing different clothes. Douglas Jr. testified: "Code on the streets is don't tell, snitch. [¶] . . . [¶] Could be the end of you, could be fatal." Douglas Jr. admitted that he had a criminal history, including convictions for possession of a stolen car and petty theft. He was on probation at the time of the shootings.

On cross-examination, however, Douglas Jr. was asked about his statements to police after the shooting. Douglas Jr. initially told police that he had been robbed by someone he did not know. After being released from the hospital, he repeated the same story. He was contacted by officers again on November 9 and November 10. On November 10, the police came to Douglas Jr.'s house and said, "you gotta come talk to us." Douglas Jr. explained that he didn't want to talk. The officer's asked Douglas Jr. if he was on probation. When he said "yes," the police said: "[T]ough luck. You're going with us now." At that point, Douglas Jr. "felt there was no options, really . . . . [He didn't] want to go to jail." Douglas Jr. was taken to the Martinez police station, where the officers said nothing further about his probation. At the station, Douglas Jr. finally mentioned he was with Perez and Moore. Thereafter, the police "kept bothering" him.

5

Douglas Jr. continued to resist talking to police.  On November 16, Douglas Jr. again spoke with the police.

*Perez's Testimony*

Perez testified that, on November 6, 2009, Douglas Jr. drove by the West Ruby Street projects, where Moore and Perez were hanging out.  Moore and Perez walked over to his car.  Moore got into the car, while Perez stayed behind.  Moore and Douglas Jr. returned 10 or 15 minutes later.  Douglas Jr. gave Moore and Perez a ride to San Pablo.  Along the way, the three stopped by a gas station and smoked methamphetamine.  Douglas Jr. then dropped the women off at Moore's friend's home, in San Pablo, where they watched television.

Later that evening, Douglas Jr. returned to pick up Moore and Perez.  According to Perez, he drove them straight back to North Richmond.  Douglas Jr. commented that he needed to get his hair twisted again, and Moore agreed to twist his braids for him.  Douglas Jr. drove the women to his father's home on First Street where he kept his hair products.

Douglas Jr. arrived at his father's house and backed his car into the driveway.  Douglas Jr. went inside the house for several minutes while the women waited in the car.  Douglas Jr. returned with his hair products.  However, unlike Douglas Jr., Perez testified that once back in the car, Douglas Jr. complained that he needed to fix the amplifier in his car to improve the sound quality.  Moore offered that she knew how to adjust the amplifier, and the two of them opened the trunk and worked for several minutes while Perez waited in the back seat.  When they finished, Moore returned to the passenger seat and Douglas Jr. headed for the driver's seat.  As Douglas Jr. started to get in the car, Perez saw Turner approaching.

Turner went to the passenger side of the vehicle and started arguing with Moore, telling her to get out.  The passenger door was open, and at some point Moore began hugging Turner around the waist, saying, "[B]aby, it's okay.  Stop."  Douglas Jr. was standing between the car and the open driver's side door.  Perez heard a gunshot and saw Douglas Jr. fall to the ground.  Perez testified that she had seen a black handgun in

6

Turner's left hand, which was pointed at the ground when Turner was arguing with Moore.[6] Perez was asked: "If [Turner] was holding the gun, and he was pointing the gun over the hood of the car, would you have been able to see his hand or the gun from your vantage point?" She answered: "No."

After the shot was fired, Moore was already out of the car and the passenger door was closed. Turner looked at Perez and said, " 'Vanessa, get out.' " Perez said she was "freaking out." She could not open the passenger door because it was broken, so she climbed out through the driver's door. When she got out of the car, Turner told her not to tell anyone. She promised she would not and started to run. She noticed a second man standing on the sidewalk, but she did not see him holding a gun. When Perez was around the corner, running toward the projects, she heard approximately four more shots fired. Moore ran in the opposite direction. Perez did not see anyone go through Douglas Jr.'s pockets.

A few days later Perez was picked up by police and spoke with them at the police station. From a photographic lineup, she identified Turner as the shooter. Since December of 2009, Perez had been receiving $800 per month for rent and $575 for incidentals from the district attorney's witness relocation program. She had been threatened by a man named "Dante."[7]

*Jeff Moule's Testimony*

Jeff Moule, then a homicide sergeant with the Contra Costa County Sheriff's Office, responded to the scene. On November 7, Moule interviewed Douglas Jr. after he was released from the hospital. Douglas Jr. told Moule that two unknown men ran up to him, said it was a robbery, shot him, and then fled on foot. Douglas Jr. did not mention Perez or Moore. Later on November 7, Moule received a tip about the identity of the

---

[6] At the preliminary hearing, Perez testified that Turner was holding the gun in his right hand.

[7] The jury was instructed: "[T]here is no evidence linking [Turner] to the threat with regard to [Perez] . . . and it is not evidence against [Turner] in this case."

7

shooter. Moule prepared a photo lineup including Turner's picture and showed it to Douglas Jr. that evening. Douglas Jr. claimed that the shooter was not in the lineup. However, Moule observed that Douglas Jr. avoided looking at Turner's photograph.

On November 9, 2010, Moule again met with Douglas Jr., who said that he lied in his earlier statement because he feared for his safety and that of his family. He told Moule that "[the police] were on the right track" and to keep doing what they were doing. Moule asked Douglas Jr. to come to the station to give an interview the next day, but agreed to let Douglas Jr. discuss it with his family first.

The following day, Douglas Jr. initially balked at going to the station. Moule then told Douglas Jr. that he was interfering with the investigation and "being on probation, that is not really a proper way to interact with law enforcement." Moule told Douglas Jr.: "[H]e needed to come down, that [Moule] hadn't called his probation officer but . . . could have done [so]." At this point, Douglas Jr. agreed to be interviewed at police headquarters. In the interview, Douglas Jr. finally mentioned he was with Perez and Moore, mentioned the incident on Warren Street, and gave a more detailed account of the shooting. Douglas Jr. was clear that the same man with the gun on Warren Street was the shooter. However, he still hesitated to identify the shooter, saying he was not comfortable doing so and needed to talk to his relatives.

On November 11, Moule interviewed Perez, who gave a full account of the evening and identified Turner as the shooter. Turner turned himself in that same day. On November 14, Douglas Jr. called Moule and said that the shooter's photo had been in the bottom right corner of the photographic lineup. That photo was of Turner. On November 16th, Douglas Jr. came to the station on his own. He picked Turner out of a new photographic lineup and gave a taped statement identifying Turner as the shooter. The prosecution played a video recording of Douglas Jr.'s November 16th taped interview.

*Physical Evidence*

Four shell casings were found at the scene. A fired projectile was also found in the front passenger floorboard area of Douglas Jr.'s car. Bullet damage was found in the

8

roof. Ballistics testing demonstrated that the four shell casings found at the scene were all fired by the same .40 caliber semiautomatic handgun.

Defense Case

*Rhashonda Stevenson's Testimony*

Turner's mother, Rhashonda Stevenson, testified that Turner is left-handed. On November 11, 2009, Stevenson drove Turner to the police station, after learning that he was a murder suspect. She also confirmed that Turner and Moore had a child together. The child was born in September 2008.

*Turner's Demonstration*

Turner did not testify. However, he was directed by defense counsel to handwrite his name and the letters A through F on an easel in front of the jury. The record reflects that he did so with his left hand.

Verdict and Sentence

In his closing argument, Turner's trial counsel argued that the prosecution's main witnesses, Douglas Jr. and Perez, were not credible. He maintained that their testimony implicating Turner was not corroborated, as Turner was left-handed and there was no fingerprint or DNA evidence tying Turner to the scene.

The jury convicted Turner, on count one, of the lesser included offense of second degree murder and, on count two, the lesser included offense of attempted voluntary manslaughter. The jury also found the firearm enhancements to be true as to both counts. The jury found Turner not guilty of robbery, but hung on the lesser included offenses for that charge, and the court declared a mistrial as to the lesser charges. Turner was sentenced to a term of 47 years to life in state prison and the prosecution dismissed the remaining charges. Turner filed a timely notice of appeal.

**II.   DISCUSSION**

On appeal, Turner contends that: (1) Douglas Jr.'s statements to police, made after November 10, 2009, were coerced and that their admission at trial violated Turner's right to a fair trial; and (2) that the trial court violated Turner's due process rights by

9

instructing the jury pursuant to CALCRIM No. 375 on consideration of evidence of other offenses (the Warren Street incident) to establish identity.

## A.     *Coerced Statements to Police*

First, Turner argues that the trial court erred by denying his motion to exclude Douglas Jr.'s statements to police made after November 10, 2009.  He contends that the statements were coerced and that their admission (in the form of the videotaped interview and Moule's testimony) violated his right to a fair trial.

"[D]efendants generally lack standing to complain that a police interrogation violated a third party witness's Fifth Amendment privilege against self-incrimination or Sixth Amendment right to counsel, nor may a defendant complain that law enforcement officers violated a third party witness's Fourth Amendment rights.  (*People v. Badgett* (1995) 10 Cal.4th 330, 343 [(*Badgett*)].)  A defendant may assert a violation of his or her own right to due process of the law and a fair trial based upon third party witness coercion, however, if the defendant can establish that *trial* evidence was coerced, or rendered unreliable by prior coercion, and that the admission of this evidence would deprive the defendant of a fair trial.  (*People v. Jenkins* (2000) 22 Cal.4th 900, 966, 969; [*Badgett,*] at pp. 347, 348.)"  (*People v. Williams* (2010) 49 Cal.4th 405, 452–453, parallel citations omitted.)  The defendant bears the burden to prove both "improper coercion" and that "the pretrial coercion was such that it would actually affect the reliability of the evidence to be presented at trial."  (*Badgett,* at p. 348, fn. omitted.)

"[T]he primary purpose of excluding coerced [statements] is to assure the reliability of the trial proceedings . . . ."  (*Badgett, supra*, 10 Cal.4th at p. 347.)  "Although the out-of-court statement itself may be subject to exclusion because coercion rendered it unreliable, it is more difficult for a defendant to establish that the court should exclude the witness's *trial testimony*.  As we have explained, '[t]estimony of third parties that is offered at trial should not be subject to exclusion unless the defendant demonstrates that improper coercion has impaired the reliability of the testimony.' ([*Badgett,*] at p. 348.)  The burden rests upon the defendant to demonstrate how the earlier coercion 'directly impaired the free and voluntary nature of the anticipated

10

testimony in the trial itself' (*People v. Boyer* (2006) 38 Cal.4th 412, 444) and impaired the reliability of the trial testimony ([*Badgett,*] at p. 348)." (*People v. Williams, supra,* 49 Cal.4th at p. 453, fn. & parallel citation omitted.)

"On appeal, we independently review the entire record to determine whether a witness's testimony was coerced, so as to render the defendant's trial unfair. [Citation.] In doing so, however, we defer to the trial court's credibility determinations, and to its findings of physical and chronological fact, insofar as they are supported by substantial evidence." (*People v. Boyer, supra,* 38 Cal.4th at p. 444.)

1.     *Background*

In the middle of Moule's testimony, outside the presence of the jury, Turner's trial counsel moved to exclude any statements Douglas Jr. made to police after November 10, 2009, on the ground that the statements were coerced. Specifically, Turner's trial counsel argued: "[I]t is my position those statements over the next five-day period—it's not a long period, less than a week—were coerced statements, not in the sense of a gun to the gentleman's head, but in the sense he had no choice, given the prospect of incarceration, and it would be a violation of due process to admit those statements from that point forward . . . ."

A hearing was held pursuant to Evidence Code section 402, in which Moule was examined by the People and defense counsel. Moule testified: "[On November 10,] I [told Douglas Jr.] the problem is . . . yesterday, you told us that you lied to us, you know. This is a homicide. It's a serious investigation. You're on probation. I think you need to come down with us. You know, you admitted to interfering with our investigation. We're heading in a direction and then you lied to us. You told us nope, that's not it. [¶] So now we're looking around some more. We're using resources, . . . but then you admit no, that was a lie. You're on the right track. We're at a standstill waiting on your truthful statement regarding what happened here. [¶] Will you please come with us and talk with us . . . ? [¶] . . . [¶] I don't recall I ever said . . . you're going to be under arrest or going to jail or anything like that. You know, I made mention of probation, calling his probation officer. I said I had not yet. Made mention that he was interfering, and . . . by

11

admitting that he lied to us and we're on the right track, he was confusing our investigation, and we needed to get the truth out so we can move forward. That was the extent." When Douglas Jr. did speak to Moule, later that day, he discussed the involvement of Moore and Perez, the Warren Street incident, and also said that the same man later shot him and his father. However, Douglas Jr. continued to refuse to identify the shooter by name.

Between November 10 and November 14, Moule repeatedly called and left messages for Douglas Jr. On November 14, 2009, Douglas Jr. called Moule on the phone and said he "want[ed] to come clean." Douglas Jr. identified the shooter's location in the photographic lineup he had previously been shown. No mention of probation or interference with an investigation came up during that conversation. On November 16, 2009, Douglas Jr. showed up at the police station on his own. Moule showed Douglas Jr. a second photo lineup and recorded a short interview. During that interview, Douglas Jr. identified Turner as the shooter. Douglas Jr.'s car and cell phone were returned to him that same day. Douglas Jr. was never handcuffed.

After hearing argument, the trial court concluded that the police conduct did not rise to the level of coercion. The trial court explained: "First of all, naturally they were calling him because he was a victim and percipient witness, so I don't find that coercion. They gave him a lot of opportunity to come forward. While . . . Moule mentioned that the probation, and certainly one could say there's an implicit threat in that. I don't find that he threatened him in any way that caused [Douglas Jr.] to come forward. [¶] I think [Douglas Jr.] came forward on his own volition, and I think that's particularly highlighted by the fact that on November 14, [Douglas Jr.] calls . . . and comes in [on November 16,] voluntarily. He comes in on his own. He isn't even picked up and brought in by law enforcement then . . . . And there was a lapse of time between the first interview on the 10th and when he ultimately called . . . on the 14th of November. [¶] So I'm not finding that he was coerced or threatened, and I do agree that if you do mention the probation officer, there could be an implicit threat there, but he just mentioned 'I haven't called the probation officer.' He hasn't gone on in great detail . . . about what could happen . . . if I

12

called probation officer. [¶] And I do find . . . Moule very credible." Turner's motion was denied.

2.    *Analysis*

Turner contends that Moule's reference to Douglas Jr.'s probation officer made the statements coerced. A witness's statement is coerced if it is the product of police conduct which overcomes the individual's free will. (*People v. Lee* (2002) 95 Cal.App.4th 772, 782 (*Lee*).) A statement is considered involuntary if not " ' "the product of a rational intellect and a free will." ' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 398.) Voluntariness is tested by the totality of the circumstances, including the details of the interrogation and the characteristics of the witness. (*People v. Hill* (1992) 3 Cal.4th 959, 981, disapproved on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226.)

During witness interviews, the police "are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the [witness] speaks truthfully about the crime. [Citation.] The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 340.) Urging an individual to tell the truth is not coercive. (*People v. Hill* (1967) 66 Cal.2d 536, 549.) Further, even if the police promise a benefit, if it is one "which flows naturally from a truthful and honest course of conduct," the conduct is not improper, ergo, not coercive. (*Ibid.*) "We have never held, nor has any authority been offered in support of the proposition, that an offer of leniency in return for cooperation with the police renders a third party statement involuntary or eventual trial testimony coerced." (*Badgett, supra*, 10 Cal.4th at p. 354.)

In *Lee*, *supra,* 95 Cal.App.4th 772, the reviewing court reversed the defendant's murder conviction after determining that police had coerced a statement from a witness by giving him a polygraph test, falsely stating that the test indicated a 97 percent probability that the witness himself was the killer, and threatening to charge him with first degree murder if he did not name the defendant as the killer. The officer, not the

witness, first brought up the defendant's name in connection with the murder. (*Id.* at pp. 781–785.) The reviewing court concluded that that the witness's statement was coerced. It observed: "It is . . . well established exhortations directed to the suspect or witness to 'tell the truth' are not objectionable. . . . [¶] . . . [¶] . . . [But,] the interrogation of [the witness] was not designed to produce the truth as [the witness] knew it but to produce evidence to support a version of events the police had already decided upon. In this respect, the police crossed the line between legitimate interrogation and the use of threats to establish a predetermined set of facts." (*Lee,* at pp. 785–786, fns. omitted.)

Contrary to Turner's suggestion, this case is nothing like *Lee, supra*, 95 Cal.App.4th 772.[8] Moule did not lie to Douglas Jr., threaten to call his probation officer unless he implicated Turner, nor did Moule ever suggest any particular statement police wanted Douglas Jr. to give. There is no evidence that, before Douglas Jr. implicated him, Turner's name was even mentioned by Moule. To the extent Moule pressured Douglas Jr., it was only to tell the truth. Such pressure is permissible. (See *People v. Boyer, supra,* 38 Cal.4th at p. 445; *People v. Jenkins, supra,* 22 Cal.4th at p. 1010; *People v. Hill, supra,* 66 Cal.2d at p. 549.) Even immediately after being subject to Moule's pressure, on November 10, Douglas Jr. continued to refuse to name the shooter. It was only days later, after Turner had turned himself in, that Douglas Jr. himself initiated statements to police that implicated Turner. The evidence in fact indicates that any "coercion" Douglas Jr. felt was not from police conduct, but from his concern not to be identified as a "snitch" who voluntarily provided information to police. We conclude that Turner has not met his burden, under the totality of the circumstances, to show that Douglas Jr.'s statements, made after November 10, 2009, were tainted by improper coercion.

---

[8] Turner also misplaces his reliance on cases involving coerced confessions of defendants themselves. In such a situation, the burden is on the prosecution to show the confession was made voluntarily. (*Badgett, supra,* 10 Cal.4th at p. 348.)

14

B.      *CALCRIM No. 375*

Next, Turner contends that the trial court erred, and violated his due process rights, by instructing the jury with a modified version of CALCRIM No. 375.  The jury was instructed as follows:  "The People presented evidence that the defendant committed another offense of brandishing a weapon in violation of . . . section 417 that was not charged in this case; [¶] AND [¶] The People presented evidence that the defendant had an altercation with [Moore] and [Douglas Jr.] on Warren Street before the shooting. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant committed the uncharged offense and/or had the altercation.  Proof by a preponderance of the evidence is a different burden of proof than beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offense or act you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] The defendant was the person who committed the offenses alleged in this case; or [¶] The defendant acted with the intent to rob [Douglas Jr.], kill [Douglas Jr.] or kill [Douglas Sr.]; or [¶] The defendant had a motive to commit the offenses alleged in this case. [¶] Do not consider this evidence for any other purpose except for the limited purposes of identity, intent and/or motive. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you conclude that the defendant committed the uncharged offense and/or act, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of murder, attempted murder, or robbery.  The People must still prove each charge and allegation beyond a reasonable doubt."

Turner argues that his due process rights were violated because "the Warren Street incident was not [Evidence Code section] 1101(b) evidence" and that "this instruction . . . permitt[ed] the ultimate issue of identity to be proven by a lesser standard of proof."  We need not decide the issue, because we find that Turner invited any error.

15

1. *Background*

Contrary to Turner's contention on appeal, it was defense counsel who specifically requested CALCRIM No. 375 and not the People. In response, the People proposed a modification to CALCRIM No. 375.

The following discussion regarding the proposed modification took place on the record:

"[DEFENSE COUNSEL]: What [the prosecutor] has done in the instruction is he's taken out the two types of evidence that this instruction applies to the evidence of other crimes and evidence of other acts—(a) and (b) sections in the general instruction, combined them and worded it as an altercation that [Turner] was involved in, and that's all they have to prove by a preponderance of the evidence that there was an altercation that he was involved in. And that's not the case. That's not the law. That's not what triggers you having to give this instruction. What triggers you having to give this instruction is the evidence of other uncharged offenses. You have to specify what those offenses are. In this case, at a minimum, there's a brandishing, arguably, there's also a false imprisonment by pointing the gun and making him stop, and so it's not enough for [the prosecutor] to prove by a preponderance an altercation that [Turner] was involved in in some generic way, but rather there are specific offenses that were committed and those offenses, if proved to the preponderate standard, can be used to establish a motive, identity, and then [intent.] [¶] . . . [¶]

"I think we have to specify for them what those offenses were and the reason for that is that *this instruction is really supposed to apply* [*to*] *1101 situations where more commonly what happens . . . is that you have a case brought to trial and then you have another crime that's been adjudicated, or not, at some prior date that's not even related to this crime in the sense of happening on the same day or anything like that.*

"THE COURT: Right.

"[DEFENSE COUNSEL]: And then it's either criminal signature or may provide motive because it's the same victim at a different time or something like that. *Here we have a somewhat different—although, obviously not unprecedented situation where on*

16

*the same day, there's a previous altercation which gives* [*Douglas Jr.*] *the ability to identify the suspect, allegedly, as well as motive and these other things. Nonetheless, because it is other crimes evidence, I think it has to be spelled out as such* and more general references to whether the defendant was involved in an altercation is insufficient. [¶] . . . [¶] *So I would propose that you keep the instruction* as you printed it out, insert the words 'brandishing' and then, if you agree, 'false imprisonment' or just 'brandishing'—either one I'd probably be comfortable with in (a)—and the rest of the instruction as it goes.

"THE COURT: Wouldn't that then require, though, that I have to give instructions on the elements of brandishing and false imprisonment as well?

"[DEFENSE COUNSEL]: In theory, yes.

"THE COURT: And when I look at this instruction, I'm not sure it's applicable to these facts. And I'm looking at the bench notes that indicate that the Court must give this instruction on request when evidence of other offenses has been introduced. . . . [¶] Doesn't seem like it's applicable to the facts in this case." (Italics added.)

Turner's trial counsel agreed that "[CALCRIM No. 375 is] not applicable as a sua sponte instruction" but argued that it should be given nonetheless because "the Court must give this instruction on request when evidence of other offenses have been introduced." He explained: "[CALCRIM No. 375] traditionally comes up in the situation where there's a clear distinct crime either the defendant's been convicted of or committed at an entirely different time or different day. [¶] While that's the more common situation for this to come up, it does appear to apply to our situation because other offenses have been introduced, and the People are trying to claim that those other offenses prove . . . the motive, intent, and identity elements. [¶] And so given that they're trying to do that, *I think that the instruction is proper, but not as modified by counsel*." (Italics added.)

The prosecutor responded: "Your Honor, let me tell you the problem I have with the instruction . . . . My point is, what if the jury believes there was an altercation, what if they believe [Douglas Jr.] is accurate in his identification of [Turner] on Warren Street?

17

What if they're convinced of that, but yet they're not convinced that a crime was committed, and the instruction tells them to reject all of that evidence if they're not convinced a crime was committed. And that's why I put altercation down because if they feel that [Turner] had a gun but didn't brandish it or that he made comments but they don't rise to the level of false imprisonment, *then* [*Turner*] *would benefit from this instruction*, unfairly in my view, because in that instance, according to the instruction, the jury would be required to reject and not consider any of the evidence of what happened on Warren Street, and that is patently unfair and incorrect. [¶] That's why I put in altercation because the fact that he saw this man out there is important to this case, and the fact that the man got into some sort of beef or altercation with [Moore] is also important to this case. It's not important to this case that he may or may not have brandished a firearm in the sense that he committed a crime out there at that scene, so the evidence wasn't introduced in some fashion to show because he brandished therefore he killed. [¶] The evidence was introduced to corroborate the identification of [Turner] by [Douglas Jr.], and to show that there is a motive."

Turner's trial counsel responded: "The way you get around the problem that [the prosecutor] mentions is *you write the instruction in the conjunctive* [*sic*]. [¶] *So if the People prove either the commission of a crime or . . . the fact that they saw each other at least on Warren Street*—then you can use this evidence for these purposes, and so that's the way you get around it. [¶] *You don't toss out the entire instruction. . . .* [¶] . . . [¶] . . . And so I think if you word it with an 'or' between—either he committed these crimes or they saw each other on Warren Street or something like that, that would be the way for [the prosecutor] to still be able to argue that, at a minimum, he had an ability to identify him later in a photo lineup because he had seen him before and . . . that's how he recognized the shooter . . . ." (Italics added.)

Later in the discussion regarding jury instructions, the court returned to CALCRIM No. 375. The following colloquy occurred on the record:

"[DEFENSE COUNSEL]: What I'm asking is that in the (a) paragraph, [section] 417, comma, brandishing firearm, refer to the definition elsewhere in these

18

instructions.  Then I suppose in paragraph (b), it could be worded as the defendant and [Douglas Jr.] had a confrontation earlier on Warren street.

"THE COURT:  I could use the language that [the prosecutor] proposed.

"[DEFENSE COUNSEL]:  Sure.  Yeah, as long as it's in a separate paragraph, but 'involved' is what I'm objecting to, not so much 'an altercation,' just 'involved' is too vague a term.  So they had an altercation.  That would be sufficient in my view.

"THE COURT:  I think that's what he said.

"[DEFENSE COUNSEL]:  That they had an altercation on Warren street, that would be fine.

"THE COURT:  Yes.

"[DEFENSE COUNSEL]:  That would specify it enough for my purposes.

"THE COURT:  Okay.  I'll use that language."

2.      *Analysis*

We agree with the People that the doctrine of invited error bars Turner from raising his current complaint.  "The doctrine of invited error bars a defendant from challenging an instruction when the defendant has made a conscious and deliberate tactical choice to request it.  [Citations.]"  (*People v. Enraca* (2012) 53 Cal.4th 735, 761; *People v. Harris* (2008) 43 Cal.4th 1269, 1292–1294.)  " 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest.  If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.'  In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule.  [Citations.]"  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49; see also *People v. Wader* (1993) 5 Cal.4th 610, 657–658.)  If the record shows no tactical decision, the invited error doctrine is not applied.  (*People v. Harris, supra,* 43 Cal.4th at p. 1299.)

Here, as the above excerpts from the record make clear, Turner's trial counsel did not merely acquiesce.  In fact, he affirmatively requested CALCRIM No. 375 and

19

affirmatively sought the modified language that was ultimately presented to the jury.  We can infer that Turner sought a tactical advantage in doing so.  Namely, he sought to add to the prosecution's burden of proof with respect to the Warren Street incident.  Thus, Turner cannot be heard to challenge the instruction on appeal.

### III.    DISPOSITION

The judgment is affirmed.


_____
Bruiniers, J.


We concur:


_____
Jones, P. J.


_____
Simons, J.