Filed 3/7/24  P. v. Tavares CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C098076 |
| Plaintiff and Respondent, | (Super. Ct. No. LODCRFECOD202112458) |
| v. | |
| JARED TAVARES, | |
| Defendant and Appellant. | |

A jury convicted defendant Jared Tavares of two counts of attempted murder (Pen. Code, §§ 664/187—counts 1-2),[1] four counts of assault with a semiautomatic firearm (§ 245, subd. (b)—counts 3-6), one count of shooting at an occupied vehicle (§ 246—count 7), one count of unlawful possession of a firearm by a person previously convicted of a felony (§ 29800—count 8), one count of knowingly permitting another person to

---

[1] Undesignated statutory references are to the Penal Code.

1

discharge a firearm from a vehicle he owned or drove (§ 26100, subd. (b)—count 9), and one count of misdemeanor sale of marijuana (Health & Saf. Code, § 11360, subd. (a)(2)—count 10). The jury found true that defendant was armed with a firearm in the commission of counts 1 through 9. (§ 12022, subd. (a).)[2] In a bifurcated proceeding, the trial court found defendant had suffered a prior conviction for a serious felony (§ 667, subd. (a))[3] that also constituted a strike, and found true some aggravating factors for purposes of sentencing. The court sentenced defendant to a total term of 37 years and eight months in prison.

On appeal, defendant contends: (1) the shooter's trial testimony was coerced by a plea agreement requiring him to testify that defendant shared his intent to kill; (2) even if it was not coerced, the shooter's testimony did not constitute substantial evidence of defendant's intent to kill; (3) the prosecutor committed prejudicial misconduct during closing argument; and (4) there was insufficient evidence to support count 10. We will affirm the judgment.

## I. BACKGROUND

On November 14, 2021, J.A. was driving three family members on a frontage road alongside the freeway in Lodi when gunshots hit his side of his black Lexus. One bullet hit J.A.'s ankle. Another hit his neck. J.A. testified he was driving at least 35 miles per hour at the time he lost control of the Lexus.

California Highway Patrol Sergeant James Sheeran testified that law enforcement closed the highway and found three 9-millimeter casings. Sergeant Sheeran reviewed surveillance footage and focused on two cars that appeared to conduct a transaction in the

---

[2] The jury did not find that defendant acted with premeditation with respect to the attempted murders.

[3] The court struck, pursuant to section 1385, the enhancement under section 667, subdivision (a) associated with counts 2, 5, and 6.

2

parking lot of a nearby casino before leaving at the time of the shooting. Sheeran testified the surveillance video showed a black Audi leaving the parking lot quickly and then a red Alfa Romero leaving just as quickly, as if it was trying to catch up to the Audi. B.H. was identified as owner of the Audi.

The surveillance video was played for the jury and B.H. identified the vehicles. B.H. testified to driving his son to purchase marijuana at the casino. Defendant arrived in the red Alfa Romero. Defendant got into the back of the Audi with B.H.'s son and counted $30,000, which was in $5,000 stacks. Defendant said he had a firearm on him. B.H.'s son and defendant got out of the car after they finished counting, and B.H.'s son held onto the bag of money. Defendant moved marijuana from the trunk of the Alfa Romero to the trunk to the Audi. B.H. estimated it was about 30 pounds of marijuana in black trash bags. Defendant's passenger only came to the Audi to help move the bags. Once the marijuana was in the black Audi, B.H.'s son gave defendant the money. As soon as B.H.'s son got back in the Audi, B.H. and his son drove away.

B.H.'s son showed Sergeant Sheeran his communications with the marijuana seller on his phone. Law enforcement obtained the license plate for the red Alfa Romero from the seller's social media. Defendant is the registered owner.

Jaycob Babcock testified as part of a plea agreement he signed on September 12, 2022. He pled guilty to attempted murder and three counts of assault with a semi-automatic firearm. He admitted to personally using a firearm in connection with these crimes. Babcock also admitted to having a prior felony conviction and to aggravating factors for sentencing purposes.

Babcock testified that, on November 14, 2021, defendant picked him up in the Alfa Romero and there was a gun on the floorboard. Defendant drove them to a house in Escalon to get 50 pounds of marijuana in bags. Then, they went to the casino. After the bags of marijuana were put into the back of the black Audi and the buyer handed over his bag of money, defendant and Babcock got back into the Alfa Romero and Babcock told

3

defendant he thought something was wrong because the Audi drove off quickly. Babcock said he opened the bag of money and saw stacks of $1 bills with $20 bills on top. He told defendant they had been " 'ripped off.' " Defendant said, " 'Oh, fuck, we gotta get 'em.' "

Babcock testified that they took off to find the buyers and got on the freeway traveling at least 100 miles per hour. Babcock pointed out what he thought was the Audi on the frontage road and defendant told Babcock to " 'get 'em' " multiple times. Babcock responded by grabbing the gun, sticking it out of the window, and firing about eight times toward the front of the vehicle he thought was the black Audi. Before Babcock began firing, defendant "slowed down so [they] were not exactly next to each other, but so [Babcock] would be able to fire." Babcock said he didn't think he hit it, and defendant responded, " 'You hit it. I saw the sparks.' "

When he was arrested on November 18, 2021, Babcock gave a statement to law enforcement that differed from his trial testimony and the second statement he gave to law enforcement in conjunction with his plea agreement. In his first statement, Babcock admitted he was the shooter, but said he was shooting in the air to frighten and did not intend to hurt anyone. He did not say defendant slowed down the Alfa Romero or said "get 'em." Babcock testified that his initial statement had been a lie that he thought would benefit him.

After the shooting, Babcock wrote defendant a note in jail that apologized for what had occurred and mentioned "a plan to get [defendant] to walk free." Babcock testified the plan had been to take the blame and defendant would take care of Babcock and his family, but Babcock changed his mind when he did not feel defendant would fulfill his part of the plan.

A California Highway Patrol detective testified that he documented a total of eight places where a bullet struck the Lexus, including the bullets that went through the driver's side windows.

4

## II. DISCUSSION

### A.     *Babcock's Plea Agreement*

Defendant argues Babcock's trial testimony was improperly coerced by a plea agreement requiring him to testify that defendant shared his intent to kill. We disagree.

#### 1.     *The Agreement*

Babcock testified his plea agreement stated that if he testified truthfully, he would be sentenced to 23 years in state prison. If he did not testify, he would be sentenced to 25 years to life.

#### 2.     *Alleged Coerciveness*

" '[A] defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion.' [Citations.] Because of this, '[i]mmunity or plea agreements may not properly place the accomplice under a strong compulsion to testify in a particular manner—a requirement that he or she testify in conformity with an earlier statement to the police, for example, or that the testimony result in defendant's conviction, would place the witness under compulsion inconsistent with the defendant's right to fair trial.' [Citation.] '[W]e review the record and reach an independent judgment whether the agreement under which the witnesses testified was coercive and whether defendant was deprived of a fair trial by the introduction of the testimony, keeping in mind that generally we resolve factual conflicts in favor of the judgment below.' " (*People v. Anderson* (2018) 5 Cal.5th 372, 398.)

Defendant argues Babcock's plea agreement was improperly coercive under this standard because the record demonstrates Sergeant Sheeran told Babcock the detectives wanted "shared accountability," and that was the only reason Babcock was offered a plea agreement. Defendant contends his trial testimony was required to "substantially conform" to his September 2022 statement that he had knowledge of Babcock's intent to

shoot the victims, and that he aided and abetted Babcock in the shooting. Defendant has failed to demonstrate that either was an actual condition of the plea agreement.

Defendant relies on the fact that, prior to Babcock giving his second statement on September 12, 2022, Sergeant Sheeran indicated he had been pushing for a deal because he wanted "shared accountability." Sheeran also stated, "And that's the only reason we're doing this. So I don't think you're a bad person, I think you fucked up that day. I personally think [defendant]'s the bad person. I think he'll do it again tomorrow, I think he'll do it again next year, I think he'll do it five years from now."[4]

Defendant further relies on Babcock's affirmative responses to defense counsel's suggestion during cross-examination that he was getting a deal because he was implicating defendant:

"Q. And all you had to do is say what they wanted to hear in order to get this eight-year deal, right?

"A. As in tell the truth, yes.

"Q. Yeah. Because if you did—if you came in there and said, you know, oh, he didn't say, get 'em, get 'em, get 'em, or if he . . . told the story you told the first time about how you just stuck your gun out and started shooting, well, then they wouldn't have no reason to deal with you because you're not offering up [defendant] to be falsely convicted, right?

"A. Yeah.

"Q. Right. Thank you. [¶] So you had to tell them that kind of stuff because unless you're saying something about him knowing something about you doing your shooting, and sticking the gun out and firing boom, boom, boom, boom, boom, boom, in about two seconds, they don't need you, right?

---

[4] The record indicates the plea agreement was drafted before Sergeant Sheeran made these comments, and signed after Babcock made his second statement.

6

"A. Yes, sir.

"Q. But they gotta need you if you're gonna go home in eight, correct?

"A. Yes, sir.

"Q. You don't want to do life for what you did, right?

"A. No, sir."[5]

Later, under additional cross-examination, Babcock answered affirmatively to a similar line of questioning: "[Y]ou knew that when you talked to him off the record that you had to give him something they liked. Because if you told them the truth, and the truth is this young man didn't know you were going to put that gun out the window and start shooting, if you told them that, you don't get the sweetheart deal, right?" This evidence falls short of demonstrating improper coercion.

A plea "agreement is not improperly coercive unless it 'is expressly contingent on the witness sticking to a particular version.' " (*People v. Anderson, supra*, 5 Cal.5th at p. 398.) Here, there is no evidence the plea agreement contained such a provision. Indeed, on redirect, the prosecutor and Babcock had the following exchange regarding the agreement:

"Q. So what I was gathering from the questions that [defense counsel] was asking you was that—and I wrote some quotes down here—all you gotta do is point to this guy, say what they wanted to hear. [¶] I want to be very clear with you. Any dealings with me, Sergeant Sheeran, law enforcement, we've told you to tell the truth, correct?

"A. Yes, sir.

"Q. That's what the contract is for, right?

"A. Yes, sir.

"Q. If you don't tell the truth, it's a big problem, right?

---

[5] Babcock testified he thought he could be out of prison in as little as eight years depending on credits.

"A.  Yes, sir.

"Q.  You swore to tell the truth; you took an oath?

"A.  Yes, sir.

"Q.  Have you been truthful not just today in your testimony, but when you spoke with myself and Sergeant Sheeran back on September 12th?

"A.  Yes, sir."

Our Supreme Court has " 'recognized that there is some compulsion inherent in any plea agreement or grant of immunity' " and " 'concluded that "it is clear that an agreement requiring only that the witness testify fully and truthfully is valid." [Citations.]  Such a plea agreement, even if it is clear the prosecutor believes the witness's prior statement to the police is the truth, and deviation from that statement in testimony may result in the withdrawal of the plea offer, does not place such compulsion upon the witness as to violate the defendant's right to a fair trial.' " (*People v. Anderson, supra*, 5 Cal.5th at p. 398.)  "The assumption that the witness will receive the benefit of his bargain only if his testimony is beneficial or valuable to the prosecution is not alone such an inducement as to place him under the kind of compulsion condemned in [prior case law]:  'What is improper . . . is not that what is expected from the informant's testimony . . . will be favorable to the People's case, but that the testimony must be confined to a predetermined formulation or rendered acceptable only if it produces a given result, that is to say, a conviction.' " (*People v. Garrison* (1989) 47 Cal.3d 746, 769.)  In other words, improper coercion occurs "only when the agreement requires the witness to testify to prior statements 'regardless of their truth,' but not when the truthfulness of those statements is the mutually shared understanding of the witness and the prosecution as the basis for the plea bargain." (*People v. Homick* (2012) 55 Cal.4th 816, 863.)  Babcock's plea agreement was not improperly coercive.

Defendant's reliance on *People v. Lee* (2002) 95 Cal.App.4th 772 is misplaced.  In *Lee*, a witness testified at trial that he did not see who shot the victim and that his pretrial

8

statement naming the defendant as the killer was false. (*Id*. at pp. 781-782.) The appellate court held the pretrial statement was improperly coerced and inadmissible because the police told the witness that the polygraph test he took indicated *he* was guilty with 97 percent accuracy and threatened him with a first degree murder charge unless he named the defendant as the killer. (*Id*. at pp. 783, 785-786.) The court noted the witness was not *Mirandized* after the polygraph test. (*Id*. at p. 786.) As the court explained, the officer's statements "went beyond mere deceit as to the evidence pointing to [the witness] as the killer. He also went beyond merely exhorting [the witness] to tell the truth. He even went beyond threatening [the witness] with prosecution for first degree murder unless he named the real killer." (*Id*. at p. 785.) Rather, the interrogation of the witness "was not designed to produce the truth as [the witness] knew it but to produce evidence to support a version of events the police had already decided upon. In this respect, the police crossed the line between legitimate interrogation and the use of threats to establish a predetermined set of facts." (*Id*. at p. 786.) Here, law enforcement did not employ similar threats. *Lee* is inapposite.

The record does not establish that Babcock's trial testimony denied defendant a fair trial.

B.      *Sufficiency of the Evidence of Intent to Kill (Counts 1 and 2)*

The prosecution's theory was that defendant was guilty of the attempted murder of J.A. and his wife because he aided and abetted Babcock in the commission of those crimes. Aider and abettor liability for attempted murder requires that the aider and abettor "know and share the murderous intent of the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) Defendant argues that even if Babcock's testimony was not coerced, it did not constitute substantial evidence of defendant's intent to kill. He argues Babcock's testimony on this issue was unreliable and uncorroborated. We conclude Babcock's testimony was sufficiently corroborated and substantial evidence supported defendant's convictions for attempted murder.

9

"A conviction can be based on an accomplice's testimony only if other evidence tending to connect the defendant with the commission of the offense corroborates that testimony. (§ 1111.) The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime. [Citation.] The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime." (*People v. McDermott* (2002) 28 Cal.4th 946, 985-986.) "It is sufficient if it substantiates enough of the accomplice's testimony to establish his credibility." (*Id*. at pp. 1000-1001.)

Babcock's testimony that defendant was the driver of the red Alfa Romero involved in the marijuana sale was corroborated by B.H.'s testimony, surveillance footage, and evidence regarding ownership of the Alfa Romero. Babcock's testimony regarding the fact that defendant drove them at high speeds in pursuit of the black Audi is corroborated by the surveillance footage evidence. Babcock testified that defendant slowed down so Babcock could fire his weapon. Sergeant Sheeran testified there was "a very good grouping" of bullet strikes on J.A.'s vehicle considering the target was moving and 40 to 50 yards away. The prosecution introduced and played calls defendant had with his girlfriend, in which she said, "they're thinking in their head that you . . . willingly drove the other person to go shoot." Defendant insisted this did not matter and he would be acquitted because he was not there, and Babcock would say the same thing. Taken together, this evidence supports the notion that Babcock testified truthfully at trial, including when he explained his initial statement that he only shot into the air was a lie. Considered in its totality, there was enough corroborating evidence to substantiate

Babcock's testimony and establish his credibility.  Having concluded such, it is easy to dispense with defendant's related contention regarding the sufficiency of the evidence.

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

We reject defendant's assertion that Babcock's testimony was inherently unreliable and could not have been credited by the jury because it conflicted with his prior statements and was internally conflicting.[6]  Because the testimony was

---

[6] Defendant's opening brief and reply brief both misread the record by asserting, "[A]t the proffer hearing two weeks before trial, Babcock was asked, 'He wasn't going slow with the other cars?'  Babcock responded, 'no.'  [Citation.]  *He never stated that* [*defendant*] *slowed down*."  (Italics added.)  In the portion of Babcock's trial testimony cited by defendant, Babcock says he never said defendant slowed down the *first* time he talked to Sergeant Sheeran, and disagrees with defense counsel's representation of his

11

corroborated, it was for the jury to evaluate Babcock's testimony and there was substantial evidence to support the conclusion that defendant and Babcock shared an intent to kill by shooting at the victims' vehicle.

## C. Alleged Prosecutorial Misconduct

Defendant asserts the prosecutor committed misconduct during closing argument by impermissibly misstating the law of aiding and abetting, arguing false or misleading evidence, and expressing his opinion of defendant's guilt. We disagree.

### 1. Applicable Legal Standards

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks

---

second statement on September 12, 2022. The transcript of the second statement supports Babcock's recollection:

"[Prosecutor:] [H]ow are you in relation to the car on the [inaudible] of his seat? Is [defendant] pacing the car?

"[Babcock]: Ye-yes [inaudible] not, like, next to it, but [inaudible]

"[Prosecutor]: But he wasn't going slow where the other car? Was, was-

"[Babcock]: No.

"[Prosecutor]: . . . was plenty distance between the two of you? And he wasn't maintaining the 100 miles an hour where, where he was zooming ahead?

"[Babcock]: He started slowing down at that point."

12

in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) " 'To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]' [Citation.] A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm." (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

> 2. *Alleged Misstatement of the Law of Aiding and Abetting*

Defendant argues the prosecutor's closing argument misstated the law regarding aiding and abetting. As relevant to defendant's claim, "[a]ider and abettor liability is . . . vicarious only in the sense that the aider and abettor is liable for another's actions as well as that person's own actions. . . . [T]hat person's mental state is her own; she is liable for her mens rea, not the other person's." (*People v. McCoy, supra*, 25 Cal.4th at p. 1118.) While reading the jury instructions on aiding and abetting, the prosecutor added the following italicized comment: "A person is guilty of a crime whether he or she committed it personally or if they aided and abetted the perpetrator. *They are both equally responsible for the criminal act*." (Italics added.) The prosecutor explained the jury should "leave sentencing up to the judge." The prosecutor thereafter continued reading from the jury instructions on aiding and abetting. Later, the prosecutor reminded the jury that a "person may be guilty either as the principal or the aider and abettor. They are both equally responsible for the crimes." Defendant argues the prosecutor misstated the law by improperly suggesting the jury need not consider defendant's own mens rea. Defendant forfeited this claim of prosecutorial misconduct by failing to object in the trial court. (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

Even if we were inclined, as defendant suggests for the first time on reply, to "address the merits of the argument in the interest of judicial economy to forestall a subsequent petition for writ of habeas corpus based upon trial counsel's ineffective assistance," we would conclude the argument has no merit. While " 'it is improper for

13

the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements,' " "the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666, 667.) Taken as a whole, there was no reasonable likelihood the jury understood or applied these comments in an improper or erroneous manner. The prosecutor read from the jury instructions that accurately explained the mental state required to find defendant guilty as an aider and abettor and argued defendant and Babcock shared an intent to kill the victims. There was no reasonable likelihood that the jury understood the prosecutor's comments regarding the consequences of finding defendant guilty as an aider and abettor to mean that it was not to consider defendant's mental state in doing so.

     *3.    Alleged False Evidence*

Defendant's assertion that the prosecutor committed misconduct by knowingly arguing false or misleading evidence focuses on the prosecutor's argument that defendant had the intent to kill. In the challenged portion of closing argument, the prosecutor began by referencing Babcock's testimony that defendant said " 'we gotta get 'em' " in response to learning they had been shorted:

"You have his words, 'We got to get 'em,' when you realize you've been ripped off. 'I'm not letting them get away.' Kind of makes sense. I mean they got shorted probably a lot of money. 'We got to get 'em,' and he's in charge of the car. 'Think that's them. Get 'em, get 'em, get 'em, get 'em.' " Defendant did not object to this argument.

14

The prosecutor later argued, "[Babcock] never had control of that car. This is a thousand percent in [defendant]'s control and that grouping does not happen but for his driving. [¶] You heard Sheeran even talk about how difficult that grouping was for a cop. You have two cars traveling, both in motion and you've got the [A]lpha [Romero] with a driver who's mad, just – 'I'm not letting those guys get away with this.' They are hauling." Defense counsel objected that this argument "states facts not in evidence, this imaginary stuff he's talking about now." The court overruled the objection.

The court also overruled objections to the prosecutor's assertion that "if the driver of the red car kept going at the speed he was going, there's no way [Babcock] is getting those shots off like he did. Only way this happens is because the driver [¶] . . . [¶] made it possible with his driving." The prosecutor continued, "Only way [Babcock] gets shots off . . . with the accuracy he does is because somebody put him in position to do it."

"Regarding the scope of permissible prosecutorial argument, ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*People v. Stanley* (2006) 39 Cal.4th 913, 951-952.) "Counsel is not permitted to 'assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]'; however, the reasonableness of inferences counsel draws from matters in evidence ' " 'is for the jury to decide.' " ' " (*People v. Holmes, McClain & Newborn* (2022) 12 Cal.5th 719, 787.) We must also view the remarks in context. (*People v. Centeno, supra*, 60 Cal.4th at p. 667.)

On appeal, defendant argues the prosecutor's argument presented false evidence by asserting defendant said he was "not going to let them get away with it" and arguing without evidentiary support that Babcock could not have shot the victim without defendant putting him in position to do so. We agree with the People that in context it does not appear the prosecutor was purporting to quote the testimony verbatim rather than paraphrasing. In other words, it does not appear the prosecutor was expressing a

15

belief that defendant had said the exact words, "I'm not letting them get away" or "I'm not letting those guys get away with this" as opposed to inferring that was the meaning of the words the prosecutor had expressly quoted. This was a reasonable inference. Likewise, the inference that Babcock needed defendant to slow down for him to shoot as accurately as he did was a permissible inference and fair commentary on the evidence. Defendant's assertion that these statements constituted misconduct is without merit.

### 4. *Alleged Expression of Personal Opinion*

During closing argument, the prosecutor argued, "There's no reason for this. To come up with the lies to the girlfriend, if it's as simple as I didn't know. It's because that's not true. [Defendant is] as involved in this as [Babcock], and we all know it. We know that's what the statements are. We know that's what the physical evidence shows." Defense counsel did not object.

On appeal, defendant argues this argument expressed the prosecutor's personal opinion that defendant was guilty. "Although a prosecutor may not personally vouch for the credibility of a witness, a prosecutor may properly argue a witness is telling the truth based on the circumstances of the case." (*People v. Boyette* (2002) 29 Cal.4th 381, 433.) " '[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," her comments cannot be characterized as improper vouching.' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 337.) Defendant cites *People v. Pineiro* (1982) 129 Cal.App.3d 915, for the proposition that "[i]t is misconduct for a prosecutor to argue his personal opinion of a defendant's guilt," but we conclude, as that court did, that "[t]he prosecutor did not do this in the present case: examination of his arguments to the jury demonstrates that he was merely presenting his views of deductions and inferences warranted by the evidence. His use of the pronoun 'I' did not mean that he was impermissibly injecting his personal beliefs. Again, there was no objection when the last-quoted comment was

16

made. Any misconduct on that occasion was waived." (*Id*. at p. 924.) Here, the prosecutor utilized the pronoun "we" instead of the pronoun "I." This fact only strengthens our conclusion that the prosecutor was not improperly injecting his personal beliefs but rather deducing from the evidence.

### 5. *Alleged Cumulative Error*

Defendant argues the cumulative effect of the alleged prosecutorial misconduct and other trial errors necessitate reversal. We have found no prosecutorial misconduct and no error. Thus, there was no cumulative effect. (*People v. Bennett* (2009) 45 Cal.4th 577, 618.)

### D. *Sufficiency of the Evidence the Bags Contained Marijuana (Count 10)*

Defendant argues insufficient evidence supports his conviction with respect to count 10 because the prosecution failed to present any evidence that the substance he sold was marijuana. Defendant argues "there was no drug analysis, no expert testimony and no observations of the substance that was transported and sold on November 14, 2021." Defendant also relies on various appellate cases concluding the evidence was insufficient to show the nature of the substance at issue. None of these cases is either controlling or persuasive. "Reviewing the sufficiency of evidence . . . necessarily calls for analysis of the unique facts and inferences present in each case, and therefore comparisons between cases are of little value." (*People v. Rundle* (2008) 43 Cal.4th 76, 137-138, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) Additionally, "case law is clear that the [controlled substance] element may be established by circumstantial evidence—that is, by evidence other than direct, chemical testing." (*People v. Veamatahau* (2020) 9 Cal.5th 16, 36; see *People v. Sonleitner* (1986) 183 Cal.App.3d 364, 369 ["[T]he nature of a substance, like any other fact in a criminal case, may be proved by circumstantial evidence"].) As our Supreme Court noted in *Veamatahau*, "The federal courts are of the same view." (*Veamatahau, supra*, at p. 36, fn. 7.) In one of the authorities cited by *Veamatahau*, the court explained, "Such circumstantial proof may

17

include evidence of the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence." (*U.S. v. Dolan* (4th Cir. 1976) 544 F.2d 1219, 1221; see also *Sonleitner, supra*, at p. 369 ["It may be proved, for example, by evidence that the substance was a part of a larger quantity which was chemically analyzed [citations], by the expert opinion of the arresting officer [citation], and by the conduct of the defendant indicating consciousness of guilt"].) Here, there was sufficient circumstantial evidence to establish defendant sold B.H.'s son marijuana.

Both Babcock and B.H. specifically identified the substance as marijuana. Babcock testified he went with defendant to pick up the 50 pounds of marijuana they brought to the sale and helped load the bags of marijuana into the trunk. Babcock testified he and defendant met with the buyer the night before, smoked marijuana with him, and then said they would sell him the marijuana. Babcock thought they would get $50,000 for the sale.

B.H. testified his son asked him to give him a ride to purchase marijuana. He testified his son exchanged $30,000 in $5,000 stacks of cash. He specifically testified "marijuana" was loaded into the trunk. Further, "[it] was black bags, trash bags, with the marijuana inside." He estimated it was 30 pounds. Defendant argues B.H. "did not testify that he ever observed or smelled marijuana." We note that B.H. did not testify that he did not, and the jury was entitled to draw reasonable inferences from the evidence. B.H. testified that after the marijuana was loaded into the trunk and his son handed over the money and got into the car, they took off and he did not know they were followed. Babcock, on the other hand, testified that he and defendant pursued the buyers after

18

discovering that the stacks of cash they were given included $1 bills instead of $20 bills. The circumstantial evidence indicates that, unlike defendant, B.H.'s son obtained what he was expecting from the marijuana sale. Viewing the record as a whole, and the reasonable inferences to be drawn therefrom, we conclude the evidence was sufficient to support count 10.

## III.  DISPOSITION

The judgment is affirmed.

/S/

RENNER, J.

We concur:

/S/

HULL, Acting P. J.

/S/

MAURO, J.

19