Filed 10/9/25  P. v. Hernandez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALLAN HERNANDEZ,<br><br>Defendant and Appellant. | B325468<br><br>Los Angeles County<br>Super. Ct. No. BA482331 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Shelly B. Torrealba, Judge.  Affirmed.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted Allan Hernandez of 11 counts of sexual abuse against his stepdaughter T.M. and his daughter J.H. We affirm. Statutory citations are to the Penal Code.

I

Heidy N. lived in Honduras with her daughter T.M. We refer to her as Heidy.

When Heidy was 20 years old, she met the 37-year-old Hernandez, who was visiting Honduras from Los Angeles. They began seeing each other romantically during Hernandez's visits and eventually had two children born in Honduras, a daughter, J.H., and a son. After J.H. was born, Heidy and the children moved into a house in Honduras that Hernandez provided.

Heidy and the children joined Hernandez in Los Angeles when T.M. was eight, J.H. was five, and their brother was two. Heidy and Hernandez married the next year. Hernandez hired an immigration attorney to help Heidy and the children with immigration.

The couple fought a lot.

When Heidy tried to break up with Hernandez, he would threaten to take the children and to send Heidy back to Honduras, or to kill her. T.M. and J.H. looked scared during the arguments, and their brother would cry.

Hernandez was very jealous of Heidy's relationship with any other person. He constantly tried to take her phone to look through it.

In 2019, Hernandez went to visit his family in Honduras. While he was there, he saw a picture of flowers Heidy posted on Facebook. Hernandez was incensed because he believed they were from another man. He called Heidy. When he asked her about this, she hung up.

Hernandez cut his trip short to return and confront Heidy.

When Hernandez returned, the couple argued.

Hernandez punched a hole in a wall.

Heidy had in fact started seeing another man, Alexander Martinez.

Heidy called Martinez to get her.

T.M. joined her at Martinez's home a few days later.

After J.H. told Heidy that Hernandez had spanked her with a belt, Heidy called the police.  Officers, accompanied by Heidy, picked J.H. and her brother up and took them to the station to document the marks on J.H.

About a month later, social worker Celia Reyna visited Heidy and Martinez to investigate claims *Hernandez* had made.  Hernandez accused Heidy of using drugs and acting in an inappropriately sexual way in front of T.M.  Hernandez accused Martinez of showing T.M. pornography.

During the investigation, *Hernandez* admitted he hit J.H. with a belt.

In later dependency proceedings, a juvenile court awarded Heidy custody of all three children.  J.H. and her brother moved in with Heidy and Martinez.

As part of her investigation, the social worker asked T.M. and J.H. whether anyone had touched them inappropriately.  Both girls initially denied it.

When the social worker asked a third time, in individual interviews, each girl said Hernandez had touched her.  Heidy and Martinez took the girls to the police station, where they repeated the statements.  Each girl was also interviewed by a forensic psychologist.

An information charged Hernandez with 17 counts of oral copulation or sexual penetration and lewd acts on T.M. and J.H.

T.M. and J.H. applied for U-visas, which required the district attorney's office to confirm that they had cooperated in the case against Hernandez. The district attorney made this certification about 16 months before the trial started.

Both girls testified at Hernandez's jury trial. T.M. was now 15. She had difficulty remembering some of the details, but testified that the first time Hernandez touched her was while they still lived in Honduras. When asked about incidents that occurred in Los Angeles, T.M. testified to a specific incident when she was 10 when she was playing outside with neighbors. Hernandez called her inside on the pretext that she needed to clean something. When she got inside, Hernandez instead started caressing and grabbing her shoulders and butt. Hernandez undressed her and continued to touch her shoulders, butt, chest, and thighs. Hernandez then took his clothes off. T.M. ended up on the bed with him standing over her. Hernandez's penis touched her vagina.

About a week later, Hernandez took T.M. to work with him. On the way back, he parked his van, put cardboard in all of the windows and touched T.M. He again took both their clothes off and used his penis to touch her vagina, hurting her. T.M. said Hernandez took her to work and touched her in the van about five times. One time, Hernandez licked T.M.'s vagina. Another few times, Hernandez grabbed T.M.'s head and tried to move her head toward his penis to make her lick it. On another occasion, Hernandez put his fingers in T.M.'s vagina.

T.M. also testified to incidents that occurred in their apartment. Once, T.M. woke up in the middle of the night, and

4

Hernandez was touching her butt and back.  She was laying face down, and Hernandez pulled her pants down.  She felt something go in between her buttocks and touch her anus, causing her pain.

Hernandez would kiss T.M. and put his tongue in her mouth.  T.M. would turn away.  Hernandez then asked if she "want[ed] some" and said he would not force her.  T.M. did not respond, but Hernandez continued to touch her anyway.  At times, T.M. would cry when Hernandez touched her.  He told her not to tell anyone.  She was afraid if she did tell, she would be taken away from her parents.  Hernandez touched her when she was 10 and 11, but stopped when she turned 12.

J.H. was 12 when she testified at trial.  She said the first time Hernandez touched her was when she was entering fourth grade.  She was in bed, and Hernandez got in bed with her and stroked her thighs "in a weird way."  She pushed his hand off, but he put it back, and began touching her stomach.  He then moved his hand under the waistband of her leggings and underwear and began touching her private part in a back and forth motion with a little squeezing.  Hernandez told J.H. not to tell her mom or he would hit her.

A few months later, Hernandez again got in bed with J.H.  He grabbed her and turned her towards him before kissing her on the lips and trying to put his tongue inside his mouth.  She pushed him away.  Hernandez again warned J.H. not to tell her mom.

In the summer before fifth grade, Hernandez again got in bed with J.H. and touched and squeezed her thigh.  She tried to move, but Hernandez stopped only when Heidy and T.M. returned home.

5

J.H. did not immediately reveal the abuse because she was afraid Hernandez would hit her. After Heidy got custody of J.H. and she moved in with her, J.H. felt comfortable saying what happened.

Each girl testified she had not been told she had to say certain things or testify a particular way to stay in the U.S. Heidy said she never told the girls to lie.

Clinical Psychologist Jamie Jones testified at trial about Child Sexual Abuse Accommodation Syndrome, which explains the behavior of children who have been sexually abused by people they know. This includes explanations that children often delay coming forward and, when they do, reveal only part of the story. Jones, as well as the court, stated this syndrome is not a tool for determining whether a particular child has, or has not, been sexually abused.

Hernandez testified in his defense.

He said, after Heidy cheated on him, he told her he would no longer help Heidy get legal residency. After Heidy and T.M. moved in with Martinez, Martinez called Hernandez and said they were "going to fuck [him] up" by reporting him to the police. Two weeks later, Reyna began investigating allegations of Hernandez inappropriately touching T.M. and J.H.

Hernandez denied ever touching either girl inappropriately. He denied ever taking T.M. to work with him alone. Hernandez said T.M. and J.H. had been told to tell these lies so they could get U-visas and stay in the U.S.

He testified the girls did not like him because he was strict, while Heidy and Martinez were not.

Hernandez's sister and one of his customers testified to his good character.

6

The jury convicted Hernandez of three counts of oral copulation or sexual penetration of a child 10 years or younger (§ 288.7, subd. (b)), four counts of lewd acts on a child under 14 years old (§ 288, subd. (a)), and one count of oral copulation of a person under 14 years old (§ 288a, now renumbered § 287, subd. (c)(1)) against T.M. and three counts of a lewd act on a child under 14 years old (§ 288, subd. (a)) against J.H. His total sentence was 63 years to life in prison.

## II

Hernandez challenges his convictions on several grounds.

## A

Hernandez argues the trial court erred in allowing T.M.'s and J.H.'s testimony because it was coerced and therefore inherently unreliable. This argument is incorrect.

The prosecutor rightly argues Hernandez forfeited this argument by not raising it at the trial court. (*People v. Marchand* (2002) 98 Cal.App.4th 1056, 1060.)

Even on the merits, this claim fails. Our review is independent. (*People v. Orozco* (2019) 32 Cal.App.5th 802, 811.)

Hernandez claims that T.M.'s and J.H.'s testimony was coerced because they were required by the terms of the U-visa to cooperate with law enforcement in prosecuting him. Hernandez states this meant they had to "do as law enforcement wished" and "raised an unacceptable risk that the witness' stories were fabricated by Heidy and themselves" to ensure they remained in the U.S.

Hernandez's argument misunderstands the nature of the coercion doctrine, which applies when the *government* overcomes the witness's will. (Cf. *People v. Fultz* (2021) 69 Cal.App.5th 395,

421 [witness who only agrees to testify truthfully and not in a particular manner does not give coerced testimony].)

Hernandez says the appropriate analogy is to cases where the government exerts overwhelming pressure on a person to implicate someone else lest the witness be charged. Courts have found coercion where police made improper threats, misrepresentations, and promises of leniency. (See, e.g., *People v. Lee* (2002) 95 Cal.App.4th 772, 783 [police threatened to use "irrefutable" proof in form of polygraph results to blame witness unless witness blamed person police wanted].)

Hernandez points to no evidence like that.

Instead, Hernandez claims the pressure came from the family's desire to stay in the U.S. Fear of deportation, Hernandez maintains, was a "powerful motivator" to lie.

This evidence would go to the credibility of the girls. It is a classic kind of bias, as when a witness testifies pursuant to a plea agreement or immunity agreement. (See, e.g., *People v. Wilson* (2024) 16 Cal.5th 874, 919.) Witness bias of this kind is the routine stuff of cross-examinations and closing arguments.

Hernandez unrestrictedly argued this point to the jury.

The jury, however, believed the girls and disbelieved Hernandez. Hernandez's coercion argument is not a reason to disturb this credibility determination.

B

Hernandez claims the trial court erred by permitting expert testimony regarding Child Sexual Abuse Accommodation Syndrome. This evidence was proper. We review for abuse of discretion. (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 214.)

Hernandez concedes California case law allows evidence of this syndrome. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–

8

1302 [allowing expert to testify about the syndrome for limited purpose].) However, he claims other jurisdictions have banned it and argues California should do the same. His arguments are meritless.

Hernandez cites a Pennsylvania case from 1992 that held it was error to admit expert evidence about the Syndrome. (*Commonwealth v. Dunkle* (1992) 529 Pa. 168181–184, 602 A.2d 830, 836–838.) However, *Commonwealth v. Jones* (2020) 663 Pa. 20, 44, 240 A.3d 881, 896–897, held that *Dunkle* had been effectively overruled by legislation as to the type of testimony allowed in this case. (*Ibid.* ["[W]e now necessarily hold that Section 5920 effectively overruled *Dunkle* to the extent that case can be read as categorically prohibiting expert testimony concerning victim behavior in response to sexual abuse due to it being within the ken of laypeople and not requiring expert analysis"].)

Hernandez cites a Ninth Circuit case that relied on the now-defunct *Dunkle*. (*Franklin v. Henry* (9th Cir. 1997) 122 F.3d 1270, 1273.)

More recent Ninth Circuit cases approve this evidence. (See, e.g., *Brodit v. Cambra* (9th Cir. 2003) 350 F.3d 985, 991 ["we have held that CSAAS testimony is admissible in federal child-sexual-abuse trials, when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth"].)

The trial court obeyed California law. California courts have long allowed evidence of this syndrome for the limited purpose of dispelling commonly held myths or misconceptions about child victims of sexual abuse. The evidence helps juries

evaluating the credibility of these victims.  (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479.)

Jones testified the syndrome was not a diagnostic tool. Rather, it was an explanation of the behavior of sexually abused children that might otherwise appear to undermine the child's credibility.  The court also gave the proper limiting instructions. (See *People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394 [regarding mandatory instructions].)

Hernandez argues this syndrome evidence causes the jury to believe the child witness.  California courts reject this claim so long as certain precautions are taken.  (*Sedano, supra*, 88 Cal.App.5th at p. 485 [proper limiting instructions meant this evidence was proper].)

Hernandez concedes California allows this type of testimony under certain conditions.  He concedes this court satisfied those conditions.  There was no error.

C

Hernandez argues the prosecutor engaged in prejudicial misconduct by eliciting evidence of uncharged sexual misconduct.

The prosecutor again correctly notes Hernandez forfeited this issue by failing to request a different or stronger admonishment or instruction when the court and counsel discussed this issue.  (*People v. Brown* (2003) 31 Cal.4th 518, 553.)

For purposes of analysis, we assume without deciding this testimony was improper.  This testimony was not prejudicial. This argument fails.

When questioning T.M., the prosecutor asked when Hernandez first touched her.  The young T.M. was reluctant to speak about the issue in a roomful of strangers.  The prosecutor

10

sought to put her at greater ease and to get her talking by asking when it started. Eventually T.M. replied it was while she lived in Honduras.

After T.M. described events in Honduras, the prosecutor asked her about what had happened after she moved to the U.S.

At the *prosecutor's* request, the court instructed the jury it was not to consider for any purpose testimony about conduct outside the U.S.

We presume jurors understand and follow the court's instructions. (*People v. Buenrostro* (2018) 6 Cal.5th 367, 431 (*Buenrostro*).) T.M.'s limited testimony about conduct in Honduras was not prejudicial.

Hernandez claims this evidence was prejudicial. His argument is illogical, as follows.

Hernandez claims this testimony undermined his defense that the girls were lying to avoid being deported. He contends that, if Heidy and her daughters were concocting a story about this abuse so they could stay in the U.S., they would *not* include abuse in Honduras. Hernandez concludes this testimony "was clearly devastating to the defense."

This claim is illogical because, if Heidy and her daughters were concocting the abuse, they *would* be inclined to fabricate a tale of more detailed and long-lasting abuse, because that would be the more believable invention.

In sum, referring to earlier abuse did not undermine Hernandez's defense. There was no prejudice.

### D

During trial Hernandez moved for a mistrial based on another incident of alleged prosecutorial misconduct. The court

correctly denied the motion. Again we review for abuse of discretion. (*People v. Panah* (2005) 35 Cal.4th 395, 444.)

During closing argument, the prosecutor showed a slide listing the elements for violation of section 288.7, subdivision (b). The slide stated that there were two ways to show a violation: committing oral copulation or digital penetration. The first is a general intent crime, the second a specific intent offense requiring a specific intent to obtain sexual arousal or gratification. (§ 288, subds. (b)(1), (2).) The slide omitted the requirement of specific intent to obtain sexual arousal or gratification. The instructions the court gave correctly listed the elements. The court told the jury multiple times that the court's instructions overrode anything said by the attorneys.

Hernandez argues that, even though the court gave correct instructions, because even the correct instructions were confusing, the error was not harmless. He provides no authority for this assertion.

The court properly instructed the jury, the jurors took the correct instructions into the jury room, and the court told the jury those instructions controlled. There was no error. (See *Buenrostro*, *supra*, 6 Cal.5th at p. 431.)

E

Hernandez argues the court incorrectly gave the modified unanimity instruction in CALCRIM 3501 over his objection. We reject this point. Our review is independent. (*People v. Thomas* (2023) 14 Cal.5th 327, 382.) We evaluate whether the instruction accurately stated the law and whether there was a reasonable likelihood it caused the jury to misapply the law. (*People v. Lewis* (2023) 14 Cal.5th 876, 900.)

CALCRIM No. 3501, as given, stated:

12

"The defendant is charged in Counts 1-3 with oral copulation or sexual penetration with a child 10 years old or younger, the child being [T.M.], in violation of Penal Code section 288.7(b) and alleged to have occurred between March 30, 2014 and February 27, 2017. The defendant is charged in Counts 4-7 with lewd act upon a child, the child being [T.M.], in violation of Penal Code section 288(a) between February 28, 2017 to February 27, 2018. The defendant is charged in Counts 8 and 9 with oral copulation of a child under 14, the child being [T.M.], in violation of Penal Code section 288a(c)(1) and alleged to have occurred between February 28, 2017 to February 27, 2018. The defendant is charged in Counts 13-17 with lewd act upon a child, the child being [T.M.], in violation of Penal Code section 288(a) between February 28, 2017 to February 27, 2019.

"The defendant is also charged in Counts 10-12 with lewd act upon a child, the child being [J.H.], in violation of Penal Code section 288(a) between February 25, 2018 to July 29, 2019. The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless:

"1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed;

"OR

"2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged."

CALCRIM 3501 is the modified unanimity instruction: it differs from the standard unanimity instruction, CALCRIM 3500,

13

by adding the second paragraph as an alternative way to reach unanimity. It is appropriate when a witness provides generic evidence about the kind of acts committed, the number of acts committed, and the general time period in which the acts occurred. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 557.) This happened in this case, as Hernandez concedes, by noting T.M. stated he molested her five times in his van, but described only four specific instances.

Hernandez claims that the testimony about abuse in Honduras made this instruction unclear because the jury would not know whether that abuse counted as the "alleged abuse" referenced in the instruction. This argument is meritless. Again, we expect the jury to be able to follow the court's instruction, and here the jury was instructed to disregard the testimony about Honduras. (*Buenrostro*, *supra*, 6 Cal.5th at p. 431.) However, even if the jury did not follow the instruction, the jury could convict only if all jurors agreed all alleged instances happened. Thus, if the jury improperly considered the Honduras testimony, it still found all of the U.S. abuse also happened, so Hernandez could not have been prejudiced.

Hernandez further argues the instruction was unclear because it did not answer the questions by who and over what time period. These questions were answered by the counts themselves. The jury would not have been confused. (*Buenrostro*, *supra*, 6 Cal.5th at p. 431.)

F

There was no cumulative error because there was no error.

14

## DISPOSITION

We affirm.

WILEY, J.

We concur:

STRATTON, P. J.

RUBIN, J. *

---

* Retired Presiding Justice of the Court of Appeal, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.